# GULF STATES UTILITIES CO. *v.* FEDERAL POWER COMMISSION ET AL.

No. 71–1178.  Argued December 5, 1972—Decided May 14, 1973

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, BRENNAN, WHITE, and MARSHALL, JJ., joined. POWELL, J., filed a dissenting opinion, in which STEWART and REHNQUIST, JJ., joined, *post,* p. 764.

*Benny Harry Hughes* argued the cause for petitioner. With him on the briefs was *Benjamin D. Orgain.*

*Leo E. Forquer* argued the cause for respondent Federal Power Commission in support of petitioner. With him on the brief was *George W. McHenry, Jr.*

*Robert C. McDiarmid* argued the cause for respondent cities of Lafayette and Plaquemine, Louisiana. With him on the brief was *George Spiegel.*

*Howard E. Shapiro* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Kauper, Samuel Huntington,* and *Robert B. Nicholson.*[*]

---

[*]*Howard E. Wahrenbrock* filed briefs for Public Service Company of Indiana, Inc., as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Northcutt Ely* for the American Public Power Assn., and by *Charles J. McCarthy* for Dow Chemical Co.

Mr. Justice Blackmun delivered the opinion of the Court.

This case presents the question whether, when a public utility applies to the Federal Power Commission for authority to issue a security, as the utility is required to do under § 204 of the Federal Power Act, 49 Stat. 850, 16 U. S. C. § 824c,[1] the Commission, in passing upon the application, must consider the issue's anticompetitive effect in determining whether it is "compatible with the public interest," as that phrase is employed in § 204 (a).

---

[1] "§ 824c. Issuance of securities; assumption of liabilities; filing duplicate reports with Securities and Exchange Commission.

"(a) No public utility shall issue any security . . . unless and until, and then only to the extent that, upon application by the public utility, the Commission by order authorizes such issue . . . . The Commission shall make such order only if it finds that such issue . . . (a) is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the applicant of service as a public utility and which will not impair its ability to perform that service, and (b) is reasonably necessary or appropriate for such purposes. . . .

"(b) The Commission, after opportunity for hearing, may grant any application under this section in whole or in part, and with such modifications and upon such terms and conditions as it may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

"(c) No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order."

## I

In October 1970, Gulf States Utilities Company applied to the Federal Power Commission for authority to issue for cash, on competitive bidding, $30,000,000 first mortgage 30-year bonds for the purpose of refunding part of Gulf's then-outstanding commercial paper and short-term notes.[2]

Gulf, a Texas corporation qualified to do business in Louisiana, is a public utility within the meaning of § 201 (e) of the Federal Power Act, 16 U. S. C. § 824 (e). It is engaged principally in the business of generating, distributing, and selling electric energy in southeastern Texas and south central Louisiana in an area of approximately 28,000 square miles with a population of about 1,225,000. Gulf sells electric energy at retail in numerous communities in that market and, at the time of the application, was providing electric energy for resale to nine municipal systems, 11 rural electric cooperatives (one serving four municipal systems), and one other utility.

The Commission filed notice of Gulf's application. 35 Fed. Reg. 16649 (1970). Thereupon the cities of Lafayette and Plaquemine, Louisiana (Cities) filed a protest and petition to intervene in the proceedings before the Commission and requested a formal hearing on Gulf's ap-

---

[2] Gulf, in its Securities and Exchange Commission registration statement for the bonds, stated that the proceeds received from the notes to be refinanced had been used "in connection with the Company's construction program and for other corporate purposes." App. 162. The notes themselves had been issued upon the authority of an uncontested order in FPC Docket E–7509. The Commission in that proceeding authorized a total of $80,000,000 in short-term debt. Only $55,000,000 of this was outstanding at the time of Gulf's bond authorization proceeding. Thus, apart from the bond issue, Gulf could have borrowed another $25,000,000 in short-term credit without further Commission authorization.

plication. The Cities alleged that Gulf, in concert with two other investor-owned utilities, Louisiana Power and Light Company (LP&L) and Central Louisiana Electric Company (CLECO), had engaged in activities "apparently violative of the anti-trust laws," as well as of § 10 (h) of the Federal Power Act, 16 U. S. C. § 803 (h),[3] and of the Public Utility Holding Company Act of 1935, 49 Stat. 838, 15 U. S. C. § 79 *et seq.;* that these activities, in effect, would be "financed or refinanced by the bonds here proposed"; and that the utilities' activities were incompatible with the public interest. The Cities opposed the requested authorization "unless and until Gulf States purges itself of these past violations, or unless the Commission conditions its authorization."

The Cities' claim centered on and stressed a 1968 interconnection and pooling agreement between the Cities, Dow Chemical Company, and Louisiana Electric Cooperative, Inc. (LEC). Dow has a plant near the Cities; the plant has generating capacity that could be used by the other members of the pool as emergency stabilizing capacity. LEC is a generation and transmission electric cooperative financed by the Rural Electrification Administration (REA); it is a super-cooperative composed of 12 electric distribution cooperatives, all located in the area served by the three utilities.

In 1964, the REA was considering loans to LEC for the construction of a generation station and transmission lines through which LEC would be able to serve eight of its 12 member organizations. These members were then purchasing their power from the three utilities. The Cities claimed that the three utilities had attempted to

---

[3] "Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited."

destroy LEC, and pointed to a history of "extraordinary litigation" instituted by the utilities between 1964 and 1970 to prevent the construction of the station and the lines, and in fact delaying that construction for five years. The arrangement proposed by the 1968 agreement would assure a market for the parties' surplus capacity and would coordinate, at substantial savings, the construction of new generators by the parties. The three utilities, correspondingly, would lose substantial business if the 1968 arrangement were carried out. Accordingly, Cities alleged, the three utilities engaged in frivolous and repetitive litigation and launched a public relations and lobbying drive against LEC in order to block the loan and prevent fulfillment of the agreement. Cf. *California Transport* v. *Trucking Unlimited*, 404 U. S. 508 (1972).

The REA loan was effected, however, in 1969. But by that time the loan was sufficient only for the generating facilities exclusive of the lines. Cities, Dow, and LEC, then were forced to negotiate with the three utilities for the use of the utilities' lines to transmit their power. Cities contended that the three utilities continued, through the course of the negotiations, to block or limit the pool by agreeing only to provide transmission services to some of the pool members; by refusing to supply transmission facilities between pool members unless the 1968 pooling agreement were canceled; and by demanding that LEC limit its power capacity to the wattage already planned, thus giving the three utilities the exclusive right to supply all further power needs of LEC's 12 cooperatives and precluding further expansion by LEC.

Cities, by their proposed intervention, would bring these allegations before the Federal Power Commission in the § 204 proceeding. They claimed that such anticompetitive conduct was properly the subject of a § 204 proceeding and that, under § 204 (b), 16 U. S. C. § 824c (b), the Commission may condition its approval of the

bond issue accordingly and place restrictions on Gulf's use of the proceeds.

By its answer, Gulf denied any violation of the anti-trust laws, of the Federal Power Act, or of the Public Utility Holding Company Act of 1935. It alleged that the purpose of § 204 of the Federal Power Act was "to prevent unsound financing which might impair the financial integrity of public utilities," and that even if the allegations of the Cities were accepted as true by the Commission, those matters were "irrelevant to this application."

By order issued December 3, 1970, 44 F. P. C. 1524, the Commission granted the Cities permission to intervene. It denied their request for a hearing, however, and it authorized the issuance and sale of the bonds. The order recited:

> "The requested approval of the issuance of the Bonds allow [sic] the Company only to change the form of a portion of its outstanding indebtedness, it does not call for the initiation of any construction or other program by the Company which might effect [sic] the interest of the Petitioners. The alleged violations which petitioners attempt to raise in this proceeding are irrelevant to a requested authorization of securities. There is no relief that the Commission can order in authorizing the issuance of the Bonds for refinancing purposes that would have any effect on the interest of the Petitioners, or solve any of the problems outlined by them." *Id.*, at 1525.

The Commission specifically found:

> "The matters asserted and activities alleged in the filed protest and petition to intervene by the Cities of Lafayette and Plaquemine, Louisiana, are irrelevant to the purpose of issuing bonds to refund short-

term indebtedness heretofore authorized by this Commission." *Id.*, at 1526.

The petition for rehearing required by § 313 (a) of the Act, 16 U. S. C. § 825*l* (a), see *Department of Fish & Game* v. *FPC,* 359 F. 2d 165, 168–169 (CA9), cert. denied, 385 U. S. 932 (1966), was filed by the Cities, and was denied.

Review was sought pursuant to § 313 (b) of the Act, 16 U. S. C. § 825*l* (b), in the United States Court of Appeals for the District of Columbia Circuit. A unanimous panel of that court disagreed with the Commission and remanded the case to it for consideration of the claims raised by the Cities, *sub nom. City of Lafayette* v. *SEC,* 147 U. S. App. D. C. 98, 454 F. 2d 941 (1971). The court recognized that the Commission's contention that Gulf's operations "could have no meaningful relation to an application that only sought to replace short-term notes with long term bonds" was "not without appeal, and also not without problems." *Id.*, at 109, 454 F. 2d, at 952. The court concluded, however, that the "cryptic statement of the FPC does not permit us to conclude with reasonable confidence that this was the position taken by the FPC." *Ibid.* It observed that the Commission may have rejected the Cities' allegations out of hand upon the authority of its earlier decision in *Pacific Power & Light Co.,* 27 F. P. C. 623 (1962), a position the Court of Appeals viewed as untenable under this Court's subsequent decision in *Denver & R. G. W. R. Co.* v. *United States,* 387 U. S. 485 (1967).[4]

---

[4] Cities also opposed an application of LP&L for approval by the Securities and Exchange Commission of bond and stock issues, the proceeds of which were to be used to repay short-term obligations and for other corporate purposes. Cities contended that the proceeds of these issues would be used for the construction of facilities that would further the unlawful objectives of LP&L, Gulf, and CLEC, and asked that approval by the SEC be conditioned on

Inasmuch as the decision of the Court of Appeals raised issues of potential and recurring importance with respect to the authorization of securities by the Federal Power Commission, we granted certiorari. 406 U. S. 956 (1972). The Commission took the position that the

cessation of the illegal activities and the establishment of a program to remedy the damage already done.

The jurisdiction of the SEC in this instance was based on §§ 6 and 7 of the Public Utility Holding Company Act of 1935, 15 U. S. C. §§ 79f and 79g, which are part of Tit. I of the Public Utility Act of 1935, 49 Stat. 803, 814–817. Sections 6 and 7 contain a number of requirements that must be met for SEC approval of a security issue. The most relevant of these is in § 7 (d), which requires that the SEC "shall permit a declaration . . . to become effective unless the Commission finds that—. . . (6) the terms and conditions of the issue or sale of the security are detrimental to the public interest or the interest of investors or consumers."

The SEC refused to entertain the Cities' protest, concluding that its authority under § 7 (d)(6) related solely to the terms and conditions of the security to be issued, and did not extend to collateral and unrelated controversies in which LP&L might be engaged. The Cities petitioned the United States Court of Appeals for the District of Columbia Circuit for review of the SEC orders, and the matter was consolidated with the present case. The Court of Appeals affirmed the SEC orders, but remanded Gulf's case to the FPC. It explained this diverse treatment as follows:

"Where an agency has some regulatory jurisdiction over operations, it must consider whether there is a reasonable nexus between the matters subject to its surveillance and those under attack on anticompetitive grounds. But the general doctrine requiring an agency to take account of antitrust considerations does not extend to a case like the one before us where the antitrust problem arises out of operations of the regulated company (past and projected) and the agency, here the SEC, has not been given any regulatory jurisdiction over operations of the company. The SEC has no jurisdiction over operations and stands in a different posture from the FPC which, as we have already noted, has regulatory jurisdiction over operations in view of its authority, *inter alia,* to direct utilities to interconnect on reasonable terms, or to prohibit a utility *from* discriminating in rates and facilities against its municipal customers" 147 U. S. App. D. C. 98, 112–113, 454 F. 2d 941, 955–956 (emphasis in original).

Court of Appeals was in error, but nevertheless opposed the grant.

## II

The mandate that § 204 of the Federal Power Act, 16 U. S. C. § 824c, imposes upon the Commission is a broad and impressive one. Section 204 (a) empowers the Commission to authorize the issue of a security by a public utility *only* "if it finds that such issue . . . is for some lawful object, within the corporate purposes of the applicant and compatible with the public interest." This requires the Commission to inquire into and to be satisfied with the purposes of the issue and its lawfulness. And even if its "object" is lawful, the necessary inquiry is not ended, for, in addition, the object must be "compatible with the public interest."

In making its determination under § 204 (a), the Commission is given broad powers of inquiry and enforcement. By § 204 (b) it may hold hearings on the application, may grant the application "in whole or in part," may modify it, and may impose such terms or conditions "as it may find necessary or appropriate." After opportunity for hearing, and for good cause shown, it also may supplement, modify, or condition any previous order "as it may find necessary or appropriate." *Ibid.* Section 204 (c) grants the Commission authority to specify the purpose to which the proceeds of the security may be applied and the amount allowed for that purpose. While, as Gulf observes, §§ 204 (e) and (f) exempt from § 204 (a) certain transactions that concern short-term obligations as well as public utilities that are "organized and operating in a State under the laws of which its security issues are regulated by a State commission," these exemptions [5] do not significantly detract from the sweeping

---

[5] These exemption provisions have no application to Gulf's security issue challenged by the Cities here.

powers and responsibilities of the Commission with respect to public utility security issues generally.

We are asked to hold that the Commission's responsibilities under § 204 do not extend to consideration on its part of possible anticompetitive consequences flowing from the issuance of a security. Gulf and the Commission both argue that administrative inquiry under § 204 is to be narrowly confined to the prevention of the issuance of a security that might impair the utility's financial integrity or its ability to perform its public utility service and responsibilities. Exactly this interpretation was placed on § 204 by the Commission in 1962 in *Pacific Power & Light Co.*, 27 F. P. C., at 626.[6] Gulf and the Commission contend that antitrust considerations of the kind asserted by the Cities do not fall within the limited scope of § 204 as thus defined, and consideration by the Commission of such broad-ranging issues would be incompatible with the need for relatively fast action by the Commission when it passes upon a proposed security issue. It is said that allegations of anticompetitive conduct properly may be raised and fully considered in other proceedings related to interconnections under § 202 of the Act, 16 U. S. C. § 824a, to dispositions and mergers under § 203, 16 U. S. C. § 824b, to rates and rate-making practices under §§ 205 and 206, 16 U. S. C. §§ 824d and 824e, and to adequacy of service under § 207, 16 U. S. C. § 824f.

Although allegations similar to those raised here may, indeed, be made in such other proceedings under the Federal Power Act, we do not regard that fact as determinative of the scope of Commission inquiry under § 204. Instead, the Commission's broad authority to consider anticompetitive and other conduct touching the "public interest" under the other sections of the Act emphasizes

---

[6] Cf., however, *Black Hills Power & Light Co.*, 28 F. P. C. 1121 (1962), and 31 F. P. C. 1605 (1964).

the breadth of its authority under the public interest standard generally and as embodied in § 204. This statute was enacted as part of Tit. II of the Public Utility Act of 1935, 49 Stat. 803, 850. The Act had two primary and related purposes: to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce. 49 Stat. 803–804, 847–848; S. Rep. No. 621, 74th Cong., 1st Sess., 1–4, 17–20; H. R. Rep. No. 1318, 74th Cong., 1st Sess., 3, 7–8; *Jersey Central Co.* v. *FPC,* 319 U. S. 61, 67–68 (1943); see *North American Co.* v. *SEC,* 327 U. S. 686 (1946). The Act was passed in the context of, and in response to, great concentrations of economic and even political power vested in power trusts, and the absence of antitrust enforcement to restrain the growth and practices of public utility holding companies. See S. Rep. No. 621, *supra,* at 11–12; Utility Corporations—Summary Report, 70th Cong., 1st Sess., S. Doc. No. 92, Part 73–A, pp. 47–54; 79 Cong. Rec. 8392 (1935).

In order to achieve federal regulation of these and other perceived problems on the operational level of the interstate public utility business, Tit. II was enacted. S. Rep. No. 621, *supra,* at 17; H. R. Rep. No. 1318, *supra,* at 7. Part II of Tit. II was denominated the Federal Power Act, 49 Stat. 863. Title II certainly did not preclude the operation of the antitrust laws, and it vested the Federal Power Commission with important and broad regulatory power in the areas described above. See *Otter Tail Power Co.* v. *United States,* 410 U. S. 366 (1973); Meeks, Concentration in the Electric Power Industry: The Impact of Antitrust Policy, 72 Col. L. Rev. 64 (1972). This power clearly carries with it the responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate

utility operations pursuant to §§ 202 and 203, and under like directives contained in §§ 205, 206, and 207. The Act did not render antitrust policy irrelevant to the Commission's regulation of the electric power industry. Indeed, within the confines of a basic natural monopoly structure, limited competition of the sort protected by the antitrust laws seems to have been anticipated. See *Otter Tail Power Co.* v. *United States, supra,* at 373–374; *California* v. *FPC,* 369 U. S. 482 (1962); S. Rep. No. 621, *supra,* at 12; Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 5423, 74th Cong., 1st Sess., 157–159 (1935); Summary Report, *supra,* at 52; Meeks, *supra.*

Nothing in the Act suggests that the "public interest" standard of § 204 contains any less broad directive than that contained in the other similarly worded and adjacent sections. Under the express language of § 204 the public interest is stressed as a governing factor. There is nothing that indicates that the meaning of that term is to be restricted to financial considerations, with every other aspect of the public interest ignored. Further, there is the section's requirement that the object of the issue be lawful. The Commission is directed to inquire into and to evaluate the purpose of the issue and the use to which its proceeds will be put. Without a more definite indication of contrary legislative purpose, we shall not read out of § 204 the requirement that the Commission consider matters relating to both the broad purposes of the Act and the fundamental national economic policy expressed in the antitrust laws. See *FMC* v. *Svenska Amerika Linien,* 390 U. S. 238, 244 (1968); *California* v. *FPC,* 369 U. S., at 484–485; *FCC* v. *RCA Communications, Inc.,* 346 U. S. 86, 94 (1953); *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 80 (1944). Cf. Report of National Power Policy Committee on Public-Utility Holding Companies, in S. Rep. No. 621, *supra,* at 55, 59

(App.). Consideration of antitrust and anticompetitive issues by the Commission, moreover, serves the important function of establishing a first line of defense against those competitive practices that might later be the subject of antitrust proceedings. This is particularly significant in the context of a security issue under § 204, for appropriate consideration at a pre-issue stage may avoid the need later to unravel complex transactions in granting relief under the antitrust laws or other sections of the Federal Power Act.

Our conclusion is reinforced by the decision in *Denver & R. G. W. R. Co.* v. *United States,* 387 U. S. 485 (1967). In that case the Court concluded that the Interstate Commerce Commission, in performing its duty under § 20a (2) of the Interstate Commerce Act, 49 U. S. C. § 20a (2), to determine whether the issuance of a particular security is "for some lawful object . . . and compatible with the public interest," is required, as a general rule, to consider the anticompetitive consequences of the issue. Section 204 of the Federal Power Act was modeled upon § 20a of the Interstate Commerce Act. The initial draft of § 204 was without any broad reference to the public interest. Instead, it identified four specific purposes for which a utility could issue a security (property acquisition; expansion or improvement of facilities or service; discharge or lawful refunding of obligations; and reimbursement of other expenditures for such purposes). H. R. 5423, § 206, 74th Cong., 1st Sess., 108–109; S. 1725, § 206, 74th Cong., 1st Sess., 109–110.[7] This

---

[7] "Sec. 206 (a). No public utility shall issue any security, or assume any obligation or liability as guarantor, indorser, surety, or otherwise in respect of any security of another person, unless and until, and then only to the extent that, upon application by the public utility, the Commission by order authorizes such issue or assumption of liability. The Commission shall make such order only if it finds that such issue or assumption of liability is for one or

provision intentionally was replaced with the broader language now contained in § 204 in order "to attain greater flexibility and workability than would have been possible under the original section. The language defining the purposes for which securities may be issued has been taken substantially from section 20a of the Interstate Commerce Act, which has proved its usefulness." S. Rep. No. 621, *supra,* at 20. There was, thus, a departure from the specific, and a selection of the general. We perceive no reason to view the responsibility placed on the FPC under § 204 differently from the ICC's responsibility under § 20a of the Interstate Commerce Act. Each agency possesses broad regulatory authority. Each is charged with responsibility for considering antitrust policy under its statute. And § 204 and § 20a are virtually identical in language.[8] The fact that the ICC has a specific obligation under § 11 (a) of the Clayton Act, 15 U. S. C. § 21 (a), to enforce § 7 of that Act, as well as a responsibility to advance the National Transportation Policy, did not control the decision in the *Denver* case, see 387 U. S., at 492–493, and the absence of a parallel reference in § 11 of the Clayton Act with respect to the FPC is not to be

more of the following purposes and no others, and is reasonably necessary or appropriate for such purpose or purposes; the acquisition of property; the construction, completion, extension or improvement of the facilities or service of the public utility; the discharge or lawful refunding of its obligations; and the reimbursement of moneys actually expended from sources other than the issue of securities for any of the aforesaid purposes in cases where the applicant shall have kept its accounts and vouchers for such expenditures in such manner as to enable the Commission to ascertain the amount of moneys so expended and the purpose for which such expenditure was made."

The foregoing was the Senate version. Except for one spelling and two punctuational differences, the House version was identical.

[8] The FPC has so recognized. *Pacific Power & Light Co.,* 27 F. P. C. 623, 627 (1962).

deemed controlling. Cf. *California* v. *FPC*, 369 U. S. 482 (1962).

### III

Our conclusion that the FPC must consider anticompetitive aspects of a security issue to which § 204 applies does not end the inquiry, for two subordinate questions remain: whether the agency abused its authority in refusing to hold a hearing on the Cities' objections, and whether, on the facts of this case, the Commission improperly rejected the Cities' allegations out of hand on the ground that they were irrelevant to the security issue for which Gulf sought approval.

Gulf asserts that even if the Commission is required to investigate and to consider the Cities' objections under § 204, its refusal to do so here was not error, for the Commission may summarily dispose of objections of this kind without a hearing and extended investigation. Our conclusion that, as a general rule, the Commission must consider anticompetitive consequences of a security issue under § 204 does not mean that the Commission must hold a hearing on objections in every case. Neither does it mean that every allegation must be fully investigated regardless of its facial merit, or that consideration of the allegations may not, in appropriate circumstances, be deferred, or that the major portion of a securities issue may not forthwith be authorized and only the remainder withheld for further study.[9] So strict a rule would unduly limit the discretion the Commission must have in order to mold its procedures to the exigencies of the particular case, and would be unrealistic in the light of the nature of a proceeding under § 204. The need for flexibility, planning, and rapid coordinated action is particu-

---

[9] The Court of Appeals meticulously outlined various options available to the Commission. 147 U. S. App. D. C., at 110–111, 454 F. 2d, at 953–954.

larly acute with respect to the sale of a security on the market. But where the Commission summarily disposes of proffered objections, or where it exercises its discretion to approve an issue without considering its anticompetitive consequences, "the reviewing court must closely scrutinize its action in light of the . . . statutory obligations to protect the public interest and to enforce the antitrust laws. Whether or not an abuse of discretion is present must ultimately depend upon the transaction approved, its possible consequences, and any justifications for the deferral" or summary treatment. *Denver,* 387 U. S., at 498. *Denver,* as we have noted, concerned the ICC, but the foregoing quotation from that opinion has equally forceful application in the FPC context.

Gulf also strenuously urges that the Commission in fact did consider Cities' allegations, although summarily, and properly rejected them on their merits as having no relation to the security issue or to any possible future anticompetitive conduct in which Gulf might engage. We have noted above that the Court of Appeals observed, 147 U. S. App. D. C., at 109, 454 F. 2d, at 952, that certain aspects of this argument are not without substantial appeal. On the basis of the record before us, we cannot say that, upon consideration of the objections raised by the Cities, the Commission would not be justified in rejecting them summarily. But such summary action may not go unexplained in the face of the statutory obligation placed on the Commission under § 204. The decision the Commission thus far has made provides us with an inadequate explanation of its reasons for disposing of the Cities' objections on their merits, if that in fact is what occurred. We are provided with no explanation of why summary action was warranted, and we are provided with no reason for the Commission's possible conclusion that the objections were meritless.

Without more, we are unable "closely [to] scrutinize" the Commission's action. Nor may we supply an alternative, unstated ground to support an agency's decision if that ground is one that "the agency alone is authorized to make." *SEC* v. *Chenery Corp.*, 318 U. S. 80, 88 (1943).

The decision of the Court of Appeals in remanding the case to the Federal Power Commission is

*Affirmed.*

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, dissenting.

This case raises the question whether the Federal Power Commission (the Commission) must consider the possible anticompetitive effect of a public utility's application under § 204 of the Federal Power Act, 16 U. S. C. § 824c, for authority to issue a security. Section 204 provides in relevant part that the Commission shall authorize the issuance of a security

> "only if it finds that such issue or assumption (a) is for some *lawful object,* within the corporate purposes of the applicant and compatible with the *public interest,* which is necessary or appropriate for or consistent with the proper performance by the applicant of service as a public utility and which will not impair its ability to perform that service, and (b) is reasonably necessary or appropriate for such purposes." 16 U. S. C. § 824c (a) (emphasis supplied).

Rejecting the Commission's own structuring of its responsibilities and repudiating its uniform administrative interpretation for more than a third of a century, the Court today finds implicit in § 204's use of the phrase "the public interest" a duty on the part of the Commission, when acting upon a financing application, to consider any possible anticompetitive effect that may be

alleged. As I am persuaded neither by the majority's analysis of the statutory language nor by its discussion of the regulatory context, I remain of the view that the Commission's position is consistent with the statute and I would accord it the deference to which it is entitled.[1] Moreover, for the reasons stated below, I believe that the Court's decision is incompatible with the interest of the public in assuring that utilities are enabled to meet their necessary requirements for capital upon the most favorable terms. Accordingly, I dissent.

## I

The present proceedings were initiated on October 12, 1970, when Gulf States Utilities Co. (Gulf States) filed an application under § 204 seeking authority to sell $30 million of first mortgage bonds at competitive bidding. The stated purpose for the issuance was to pay off part of its commercial paper and short-term notes, whose issuance previously had been approved by the Commission.

The cities of Lafayette and Plaquemine, Louisiana (the Cities), filed a motion to intervene on November 2, alleging a continuing conspiracy among Gulf States, Louisiana Power & Light Co., and Central Louisiana Electric Co. to block the implementation of an Interconnection and Pooling Agreement which would link the Cities, Dow Chemical Co., and Louisiana Electric

---

[1] The interpretation is entitled to great deference:

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' *Unemployment Comm'n* v. *Aragon*, 329 U. S. 143, 153." *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965).

Cooperative, Inc. (the Cooperative). The Cooperative had applied in 1964 to the Rural Electrification Administration for a loan to build a generating facility and transmission lines. The Cities contended that Gulf States and its coconspirators had used a number of techniques, including frivolous litigation, to delay approval of the loan until 1969, with the result that the amount of the loan no longer sufficed to build transmission lines as well as a generating plant. The Cooperative was thus forced to rely for transmission services on Gulf States, which, allegedly, would agree to sell them only if the Cooperative would restrict the scope of its operations. The Cities asserted, finally, that the proceeds from the present bond issue would in some way support Gulf State's anticompetitive actions.[2]

On December 3, the Commission granted the Cities' motion to intervene, but declined to hold a hearing on their allegations. The Commission's order explained more fully:

"The requested approval of the issuance of the Bonds allow[s] the Company only to change the form of a portion of its outstanding indebtedness, it does not call for the initiation of any construction or other program by the Company which might effect [*sic*] the interest of the Petitioners. The alleged violations which petitioners attempt to raise in this proceeding are irrelevant to a requested authorization of securities. There is no relief that the Commission can order in authorizing the issuance of the Bonds for refinancing purposes that would have any

---

[2] It was stated in petitioner's brief, and was not challenged, that the Commission records fail to show any other like petition to intervene in a financing application under § 204 since its enactment in 1935. The remedy which intervenors are seeking to establish is a new one not heretofore deemed necessary or appropriate by anyone. Brief for Petitioner 26.

effect on the interest of the Petitioners, or solve any of the problems outlined by them." 44 F. P. C. 1524, 1525.

In the same order, the Commission authorized the issuance and sale of the bonds. It subsequently modified the order in respects not relevant here and denied a petition for rehearing.

Reviewing the Commission's order at the behest of the Cities, the Court of Appeals held that in a § 204 application proceeding the Commission must consider claims of anticompetitive conduct when urged by intervenors. 147 U. S. App. D. C. 98, 454 F. 2d 941 (1971). While the court's ruling was flexible in terms, allowing the Commission to reject without a hearing claims which are "insubstantial or barren" or lack a "reasonable nexus" with the purpose of the securities issuance, it required an explanation "supported in the record," presumably something in addition to that offered by the Commission in this case. 147 U. S. App. D. C., at 110, 454 F. 2d, at 953.[3]

## II

It is common ground that the Commission has a responsibility to deal with anticompetitive practices in the power industry. Section 10 of the Act, 16 U. S. C. § 803, provides that the Commission may issue licenses to public utilities "on the following conditions," one of which is that:

> "(h) Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix,

---

[3] One would have thought that by its use of the phrase "irrelevant to a requested authorization of securities," 44 F. P. C. 1524, 1525, the Commission had already found—to use the language of the court—that the claims lacked a "reasonable nexus" with the purpose of the securities issuance.

maintain, or increase prices for electrical energy or service are hereby prohibited." 16 U. S. C. § 803 (h).

The question before the Court, then, is not whether the Commission has responsibility, but how and when it shall exercise it.

Stated abstractly, the Commission's position is that the most sensible method of regulating anticompetitive conduct is to focus on the conduct itself rather than on the means by which it may possibly be financed. The Commission acknowledges a duty to scrutinize allegedly anticompetitive behavior in proceedings: to order an interconnection, § 202 of the Act, 16 U. S. C. § 824a; to approve an acquisition or merger, § 203 of the Act, 16 U. S. C. § 824b; to review rates, §§ 205 and 206 of the Act, 16 U. S. C. §§ 824d and 824e; and to review a charge of unduly discriminatory rates or practices, § 205 of the Act, 16 U. S. C. § 824d, or of inadequate service, § 207 of the Act, 16 U. S. C. § 824f. Additionally, the Commission may investigate unlawful conduct upon a complaint by "[a]ny person, State, municipality, or State commission," § 306 of the Act, 16 U. S. C. § 825e, or on its own motion, § 307 of the Act, 16 U. S. C. § 825f. Indeed, upon the complaint of the respondent Cities, the Commission is presently investigating the conduct at issue here. *The Cities of Lafayette and Plaquemine, Louisiana* v. *Gulf States Utilities Co.*, F. P. C. Doc. No. E–7676.[4]

Given its broad direct authority and its undertaking to investigate allegations of anticompetitive behavior in exercising that authority, the Commission does not think it necessary or appropriate to convert § 204 into an all-

---

[4] Nor does the Commission have exclusive jurisdiction over antitrust violations by utilities. Antitrust suits may be brought by private parties or by the Antitrust Division of the Justice Department and afford other means of relief.

purpose sword.[5] As the Court of Appeals recognized, there may be no nexus or only a very weak one between the issuance of a security and alleged anticompetitive conduct and, in any event, the charges may be unfounded. It is no answer, in the Commission's view, to say that nexus and merit must be determined on the facts of each case because the process of investigating the allegations will delay the financing and often frustrate the utilities' efforts to obain a favorable price for their securities.

The Commission is properly sensitive to the complexities and subtleties of raising vast sums of money in the financial markets.[6] Utility financing normally is accomplished through competitive bidding participated in by a relatively small number of national investment firms which specialize in the purchase from issuers and the wholesaling of utility securities. The market is highly competitive and is particularly sensitive to uncertainties. The maintenance of an orderly market, with dependable marketing timetables, is essential to the financing process and to favorable decisions by the investment bankers as to rates and other terms. It is settled

---

[5] In *Pacific Power & Light Co.*, 27 F. P. C. 623 (1962), the Commission took the same position under analogous circumstances. There, the Commission approved a proposed issuance of securities to fund construction of a politically controversial transmission line, stating:

"The plain purpose of Section 204 is to prevent the issuance of securities which might impair the company's financial integrity or its ability to perform its public utility responsibilities." *Id.*, at 626.

[6] The Commssion has recognized the importance of expedition and adherence to time schedules in the administration of § 204 of the Act:

"It should also be observed that procedures for considering security issues must be expeditious if, in view of changing marketing conditions, utilities are to be able to raise the money needed to carry out their responsibilities. . . ." *Id.*, at 629.

practice to "bring an issue to market" pursuant to a carefully structured time schedule. When favorable market conditions are observed or anticipated, this time schedule is compressed usually within a period from 45 to 90 days. The longer the lead time is extended and uncertainties injected into the process, the greater the risk of market change or re-evaluation with a resulting adverse effect on the cost of capital and, in the end, on the cost of service to the public. Indeed, the public has a double interest in this process. Apart from the ultimate impact on rates which may be occasioned by disruption of the financing process, the utilities may simply be unable to keep pace with the burgeoning public demand for electric energy.[7]

Both the delicacy of financing and the availability of alternative means for regulating anticompetitive conduct, then, strongly support the Commission's interpretation of the Act. Nor does anything in the legislative history

---

[7] Prof. Priest has commented on the urgency of new capital for the electric industry:

"Since World War II, the problem of new capital has been, and will continue to be, compellingly urgent for public utility managements." A. Priest, 1 Principles of Public Utility Regulation 451 (1969).

After describing the "spectacular" growth of the electric utility industry, Prof. Priest compared the urgency of access to the capital markets of utilities with industrial enterprises:

"[T]he new capital requirements of the utility industry in the next ten years will call for extraordinary effort. The obvious reasons are (1) that regulated public utilities literally cannot produce as much cash through retained earnings as unregulated industrial enterprises and (2) that the utilities, in any event, need a much larger investment per dollar of annual revenue than the characteristic industrial." *Id.*, at 452.

It is stated in petitioner's brief, and not questioned, that in 1971, 43 applications were filed with the Commission covering the issuance of nearly $1.8 billion of securities. Brief for Petitioner 24.

of § 204 require a contrary conclusion.[8]   The Senate Report states straightforwardly:

> "Control over the capitalization of operating utilities is plainly an essential means of safeguarding the public against the *unsound financial practices* which make impossible the proper and most economical performance of public-utility functions." S. Rep. No. 621, 74th Cong., 1st Sess., 50 (1935) (emphasis supplied).

And in companion legislation entrusting to the Securities and Exchange Commission (SEC) the responsibility to regulate the issuance of securities by public utility holding companies, Congress declined to require the SEC to investigate anticompetitive conduct, at least in the ordinary case.[9]   Even apart from its relevance to congressional purpose, the absence of a requirement for such an investigation when a public utility holding company seeks authorization to issue a security supports the Com-

---

[8] Section 204 was enacted as part of Tit. II of the Public Utility Act of 1935. Title II amended the Federal Water Power Act and redesignated it the Federal Power Act.

[9] The Public Utility Holding Company Act was enacted as Tit. I of the Public Utility Act of 1935. See n. 8, *supra.* Under § 7 (d) (6) of the Public Utility Holding Company Act, the SEC is directed to disapprove an issue of securities if its terms and conditions are "detrimental to the public interest or the interest of investors or consumers." 15 U. S. C. § 79g (d)(6). The SEC has interpreted this language as not requiring it to investigate alleged anticompetitive conduct, and applied this interpretation in an aspect of this litigation involving a substantially identical challenge by these same Cities to a proposed issuance of securities by Louisiana Power & Light Co., a public utility holding company which allegedly conspired with Gulf States. See *ante,* at 754–755, n. 4. The SEC rejected the Cities' protests as pertaining to "collateral and unrelated controversies," 147 U. S. App. D. C., at 103, 454 F. 2d, at 946, and was upheld by the Court of Appeals. *Id.,* at 112, 454 F. 2d, at 955.

mission's prudent judgment to accord like treatment to applications from operating utilities.

The securities of public utility holding companies compete in the financial markets with the securities of public utility operating companies. It makes little sense, especially in construing companion legislation applicable to the same industry, to construe the term "public interest" when applied to the operating companies to mean something different, and to impose a more burdensome procedure, than when applied to utilities which are within a holding company system.[10] Yet, this will be the bizarre result of today's decision by this Court.

### III

The Court rests its decision in part on *Denver & R. G. W. R. Co.* v. *United States,* 387 U. S. 485 (1967), a case involving the issuance of a controlling stock interest in a carrier regulated by the Interstate Commerce Commission (ICC). In my view, that case falls far short of being a persuasive precedent. The transaction under consideration there was a proposed issuance of common stock by the Railway Express Agency (REA). Approximately 2,000,000 shares of REA stock were held exclusively by railroads, each of which was obligated to offer its shares to the others before selling them to outsiders. REA also was authorized to issue 500,000 shares to whomever it wished, and it entered into an agreement to sell such shares to Greyhound on the condition that

---

[10] Further evidence of congressional intent can be gleaned from the fact that Congress exempted from scrutiny under § 204 securities of "a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission." § 204 (f) of the Act, 16 U. S. C. § 824c (f). At the time of the Act, 32 States regulated the issuance of utility company securities. 79 Cong. Rec. 10378 (1935). Had Congress intended to subject securities issues to antitrust screening, it would not, presumably, have established this exception.

Greyhound would offer to purchase an additional 1,000,-000 shares from present stockholders, the offer to remain open for 60 days.

As required by § 20a of the Interstate Commerce Act, 49 U. S. C. § 20a, REA applied to the ICC for authorization to issue the 500,000 shares. Under the terms of that section, the ICC may grant authorization "only if it finds that such issue . . . is for some lawful object within [the applicant's] corporate purposes, and compatible with the public interest . . . ." 49 U. S. C. § 20a (2). The ICC authorized the issue without granting a hearing on an intervenor's claim that issuance to Greyhound would give it "control" over REA, or, at a minimum, would lead to a lessening of competition in the freight transportation market. On review in this Court, the ICC argued that its responsibility under § 20a was limited to protecting against financial manipulation, but that even if it did have an obligation to consider "control" and "anticompetitive" effects of the issuance, it could properly defer such consideration until the expiration of Greyhound's offer to purchase a large additional portion of REA's outstanding stock. 387 U. S., at 491–492.

In addressing the ICC's first contention, the Court gave scant attention to the legislative history of § 20a. After noting that an earlier version of what was to become the Interstate Commerce Act "led to a study which condemned as a 'public evil' intercorporate holdings of railroad stock," id., at 492 n. 4, the opinion shifted focus:

"Even if Congress' primary concern was to prevent [fiscal] manipulation, the broad terms 'public interest" and 'lawful object' negate the existence of a mandate to the ICC to close its eyes to facts indicating that the transaction may exceed limitations imposed by other relevant laws." Id., at 492.

One of the ICC's responsibilities, the Court found, was to consider possible control and anticompetitive conse-

quences, a responsibility deriving specifically from § 5 of the Interstate Commerce Act, 49 U. S. C. § 5, and from § 11 of the Clayton Act, 15 U. S. C. § 21. Under § 5, any conjoining of two or more carriers, either by merger or by transfer of a controlling interest of stock, must be submitted for approval to the ICC, whose approval confers antitrust immunity. Section 11 of the Clayton Act grants to the ICC authority to enforce compliance with the antitrust provisions of § 7 of the same Act, 15 U. S. C. § 18, which prohibit the acquisition by one corporation of the stock or the assets of another where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." On the facts before it, the Court saw no abuse of discretion in the ICC's decision to postpone consideration of possible control of REA by Greyhound until the expiration of Greyhound's 60-day offer, but held it an abuse of discretion to defer consideration of a possible § 7 violation.

Section 20a of the Interstate Commerce Act, interpreted in *Denver,* was, as the majority points out, the model for § 204 of the Federal Power Act.[11] But this tie by no means requires that the two sections be given identical constructions.[12] The *Denver* case involved a different

---

[11] The Senate Report indicated that § 204
"follows section 20a of the Interstate Commerce Act in defining the conditions under which such authorization is to be given, the Commission's power to issue orders and the duty of the public utilities to comply with such orders." S. Rep. No. 621, 74th Cong., 1st Sess., 50 (1935).

[12] One can hardly suppose that Congress in 1935 specifically intended to borrow the words of § 20a as they would be construed by this Court in 1967. Congress borrowed the language as it was then understood, because it had "proved its usefulness." *Id.,* at 20.

Moreover, Congress departed from the Interstate Commerce Act model when it established an exception for state-regulated securities, see n. 10, *supra,* an exception which is not found in the Interstate Commerce Act.

statute and regulatory framework, with a different administrative history.[13] Moreover, the transaction involved in *Denver,* Greyhound's purchase of stock in a regulated carrier, was arguably a *per se* violation of the antitrust laws: the effect of the acquisition might have been "substantially to lessen competition, or to tend to create a monopoly" in violation of § 7 of the Clayton Act. As indicated above, the legislative history of the Interstate Commerce Act showed particular concern with "intercorporate holdings of railroad stock." The immediacy of the antitrust issue and the obligation imposed by § 5 on the ICC with respect to Clayton Act violations justified the Court in overriding the ICC's decision not to address the issue.

In sum, *Denver* has little precedential weight in a case under the Federal Power Act, especially where the transaction does not involve on its face an arguable violation of the antitrust laws.

## IV

I return now to the facts in this case. The relationship between Gulf States' proposal to sell bonds for cash on the open market and the anticompetitive activities alleged by the Cities is, at best, an attenuated one. Indeed, the Cities do not claim that the issuance itself will have an

---

[13] No less important are the practical differences between utility and railroad financing. Because for several decades the railroads have contracted rather than expanded facilities and services, they have for the most part been able to meet their capital needs from retained earnings and equipment trust financing without resorting to the national markets for additional capital:

"Railroads may not enlarge their trackage significantly and may continue to rely largely on internal resources and the ubiquitous equipment trust to finance additional and more efficient rolling stock. But the electric, natural gas, communications, and water industries, as well as the airlines, must go to the investment fraternity for staggering amounts." Priest, *supra,* n. 7, at 451.

anticompetitive effect. Nor do they claim that the simple refunding of obligations will have such an effect. Their assertion of a relationship barely goes beyond a bald insistence that the anticompetitive conduct alleged will be "financed or refinanced by the bonds here proposed." Brief for Respondent Cities 9. Their focus consistently has been not so much on the uses to which the proceeds from the bonds will be put as on the conditions which the Commission might impose on their issuance. Indeed, the Commission believes that the lack of a substantial relationship between the Cities' allegations and petitioner's bond issue is characteristic of the lack of nexus between § 204 financing proposals generally and anticompetitive conduct by utilities.[14]

This, then, is a particularly unlikely case in which to force the Commission to investigate allegations of anticompetitive conduct. The Court apparently considers that the Cities' claim of anticompetitive conduct is at least colorably relevant to the proposed refinancing. If so, it is unlikely that any claim can be found wholly irrelevant. On the basis of today's precedent, the only justification reasonably open to the Commission for refusing to consider allegations of anticompetitive conduct will be that the allegations themselves are patently false.

If the field of inquiry is, as the Cities insist, all of a utility's proposed actions and all of its past actions as

[14] It is worthy of note that a transaction between two public utilities resembling the transaction proposed in *Denver & R. G. W. R. Co.* would be submitted to the Commission, not under § 204, but under § 203, which provides in pertinent part that:

"(a) No public utility shall . . . purchase, acquire, or take any security of any other public utility, without first having secured an order of the Commission authorizing it to do so." 16 U. S. C. § 824b.

In passing on an application under § 203, the Commission would investigate charges of anticompetitive practices. See *supra*, at 768. Thus the specific problem addressed by the Court in *Denver* would not arise under § 204.

they reflect on its proposed actions, it should be no difficult task for an intervenor to force a hearing and findings of fact. As the present case amply demonstrates, the questions of fact may be complicated ones unsuited to summary adjudication. If the Commission finds no anticompetitive conduct, the intervenor will remain free to seek judicial review of the Commission's findings, and thereby cause further delay.

In converting a special-purpose proceeding into a general-purpose one, the Court renounces an administrative interpretation of § 204 founded on the practicalities of utility financing and regulation.[15] Although other established means are available for policing anticompetitive conduct,[16] the Court imposes fresh and ill-defined obstacles to the necessary raising of capital by an industry that needs an expeditious and dependable regulatory process. And, finally, in the name of the "public interest," it ignores the critical fact that mandating a prolonged factfinding process will preclude the Commission from vindicating those aspects of the public interest peculiarly implicated by financing proposals.

I would uphold the Commission and would reverse the decision of the Court of Appeals.

---

[15] I would not foreclose the possibility that the Commission should consider in the context of a § 204 application an allegation that the issuance of the security was itself an antitrust violation. But see n. 14, *supra*. The present case is not remotely of this type.

[16] See n. 4, *supra*.