**NORTHERN CALIFORNIA POWER AGENCY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Pacific Gas & Electric Company, Intervenor.**

**No. 73–1765.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1974.

Decided March 6, 1975.

---

Ex. 1a at 148.

Martin McDonough, Sacramento, Cal., with whom Bruce McDonough, Sacramento, Cal., was on the brief for petitioner.

Thomas M. Walsh, Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F. P. C., was on the brief for respondent.

Malcolm H. Furbush, Daniel E. Gibson and Howard V. Golub, San Francisco, Cal., were on the brief for intervenor.

Before TAMM and MacKINNON, Circuit Judges, and MERHIGE,* United States District Judge for the Eastern District of Virginia.

TAMM, Circuit Judge:

On June 4, 1970, the Pacific Gas and Electric Company (PG&E) and the Sacramento Municipal Utility District (SMUD) entered into a "Power Sale, Exchange and Integration Contract" and an "Amendment to 1966 Revised Sale and Interchange Contract." Petitioner, Northern California Power Agency (NCPA) seeks review of two orders of the Federal Power Commission (Commission) which denied petitioner's request for a hearing on the antitrust implications of the PG&E–SMUD contracts which were subsequently filed as rate schedules with the Commission by PG&E. We think that the Commission's actions in this case were proper and accordingly, affirm its orders.

NCPA is a public agency created under California law by a joint powers agreement among eleven California cities, each of which owns and operates an electric distribution system supplying electric power to consumers within its boundaries. NCPA, whose members currently purchase part of their electric power from PG&E, has adopted and seeks to implement, through joint participation with other organizations, a program to provide generation of electric power supplemental to its members' present sources.[1] PG&E is a California corporation which owns and operates a public utility electric generation, transmission and distribution system throughout northern and central California, including the areas within which each of NCPA's members is located. PG&E's sales for resale of electric power in interstate commerce are subject to regulation by the Commission. 16 U.S.C. § 824(b) (1970). SMUD, a public agency of the State of California, owns and operates an electric generation, transmission and distribution system in the same northern California area as PG&E. All parties agree that the Commission is precluded from asserting jurisdiction over SMUD. See 16 U.S.C. §§ 824(b), (f).[2]

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. Joint Appendix II. at 135–36 [hereafter J.A.].

2. 16 U.S.C. §§ 824(b), (f) read as follows:

(b) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a

In 1970, PG&E and SMUD entered into contracts providing that SMUD would construct a nuclear powered electrical generating plant and sell to PG&E all capacity and energy generated in excess of that used by SMUD. The contracts also required that SMUD, under certain circumstances, would schedule the construction of a second thermal power plant from which PG&E would buy and SMUD would sell all output in excess of that used by SMUD. Additionally, the contracts provided that PG&E would make certain essential capacity and service available to SMUD. Because the sale from PG&E to SMUD was a sale of electric energy at wholesale in interstate commerce, PG&E filed the contracts with the Commission as rate schedules pursuant to section 205(c) of the Federal Power Act, 16 U.S.C. § 824d(c). Subsequently, NCPA filed its complaint with the Commission.

The gravamen of NCPA's complaint was that the PG&E–SMUD contracts were part of a scheme by PG&E to monopolize the generation of electric power in northern and central California. Thus, NCPA requested that the Commission suspend the contracts, require an answer to its complaint, and hold a hearing on the issues presented. In terms of specific relief, NCPA sought Commission findings

(a) that the June 4, 1970, contracts are unjust and unreasonable, and therefore unlawful, against the public interest, and in violation of the antitrust laws, and void, insofar as they purport to empower PG&E to exclude NCPA

from any participation in SMUD's electric power generation;

(b) that such contracts may be approved if they are amended to provide (i) for the increase in capacity of Thermal Unit No. 2 to approximately 1,150,000 kilowatts, or such larger size as the parties may agree to, with that portion of the capacity in excess of 830,000 kilowatts made available to NCPA through NCPA financing or contractual commitment for the life of the unit; (ii) for an agreement between NCPA and PG&E for the use of such increased capacity for reserves, maintenance and overhaul, delivery to NCPA members, and dispositions of surplus; and (iii) for consideration of the possibility of NCPA utilizing a part of SMUD's surpluses between the time Rancho Seco No. 1 [the first thermal plant] goes into commercial operation and prior to commercial operation of Thermal Unit No. 2 . . ..

J.A. II. at 140–41. PG&E answered the complaint, denying NCPA's essential assertions, and NCPA replied.

On June 8, 1971, the Commission issued an order which, *inter alia*, accepted PG&E's proposed rate schedules and dismissed NCPA's complaint. 45 FPC 1153 (1971). The Commission, recognizing that SMUD, a public agency of the State of California, is not subject to the Commission's jurisdiction and further, "that section 201(b) of the Federal Power Act, [16 U.S.C. § 824(b)], carefully limits [Commission] authority and that [Commission] jurisdiction does *not* extend to the 'facilities' used for the generation of

State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(f) No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto. (June 10, 1920, ch. 285, § 201, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 847.)

electrical energy," *id.* at 1155, decided it was without jurisdiction to hear NCPA's complaint. The Commission did, however, note the relevance of the then Atomic Energy Commission's jurisdiction in such matters and discussed AEC's remedial powers, exercised cooperatively with the Attorney General, to correct such potential antitrust abuses. *Id.* Summarizing the proceedings to that point, the Commission stated:

> We are dealing with a complaint, which does not allege rate discrimination, nor does it allege that the proposed rates are unjust or unreasonable. [NCPA] has requested this Commission to exercise jurisdiction over the size of a nuclear generating unit and to allocate the bulk power generated therefrom, such unit being subject to the licensing provisions of the Atomic Energy Act, and such unit being owned and financed by a government agency of the State of California. We find this Commission has no such jurisdiction.

*Id.* The Commission then found the rate schedules just and reasonable and otherwise lawful under the Act and dismissed NCPA's complaint. NCPA promptly sought rehearing, which the Commission granted for purposes of further consideration on August 3, 1971. Almost two years later, the Commission issued its final order denying NCPA's requested rehearing and stated again that it was simply without jurisdiction to remedy the alleged anticompetitive effects of the contracts. 49 FPC 1103–04 (1973). NCPA petitioned for review in this court.

■ At the outset, NCPA asserts that section 205, 16 U.S.C. § 824d, necessitates the Commission's consideration of the antitrust implications of contracts filed as rate schedules. NCPA argues that this consideration is required because: the mandate of section 205 is broad; the Commission has previously agreed that allegations of anticompetitive conduct are relevant to rate making

under section 205; the policy of the Federal Power Act is consistent with enforcement of antitrust principles in section 205 proceedings; and, the courts have consistently required regulatory agencies to consider the anticompetitive consequences of actions they are asked to approve. Petitioner's Br. at 9–22. Generally speaking, we are in full accord with petitioner's arguments. The Supreme Court and this court have held, time and again, that the Federal Power Commission, as other regulatory agencies, must consider the anticompetitive consequences of matters properly before it. *See, e. g.,* Gulf States Utilities Co. v. FPC, 411 U.S. 747, 756–62, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973), aff'g sub nom., City of Lafayette, Louisiana v. SEC, 147 U.S.App.D.C. 98, 454 F.2d 941 (1971); Denver & Rio Grande Western R. R. Co. v. United States, 387 U.S. 485, 492–98, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967); California v. FPC, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944); City of Huntingburg, Indiana v. FPC, 162 U.S. App.D.C. 236, 498 F.2d 778, 783–89 (1974); Northern Natural Gas Co. v. FPC, 130 U.S.App.D.C. 220, 399 F.2d 953, 959–61 (1968). That the doctrine is by now fully engrained in our jurisprudence is beyond question. Indeed, the Commission concedes the doctrine's general applicability in its brief to this court, Commission's Br. at 14–15, and in its order denying rehearing in this case which stated that "the Commission necessarily considers anti-competitive factors which fall [within its jurisdiction]." 49 FPC 1103, 1104. Of course, this is not to say that the doctrine is without limits or that the Commission must hold "hearings" on every complaint alleging antitrust violations. Thus, we turn to the crucial issue in this case—whether the denial of NCPA's request for a hearing on the allegations in its complaint constituted an abuse of the Commission's discretion.

In *City of Lafayette, supra,* 454 F.2d 941, this court reviewed orders of the

Federal Power and Securities and Exchange Commissions in which the petitioners had complained "that the agencies failed to take proper account of their claims that the proceeds [from the issuance of bonds, notes and stock to finance capital requirements of several utility Companies] would be used for the Companies' unlawful conspiracy to suppress competition." *Id.* at 943. Concluding that the FPC's reasons for denying a hearing did not comply with the requirement of *Denver & Rio Grande, supra,* "that the agency's reason for denying or deferring hearing of anticompetitive issues be clear on the record, meaningful in findings or discussion," Judge Leventhal, speaking for the court, then outlined the Commission's duty on remand:

> [W]e think it appropriate to say expressly that an agency is not required to hold hearings in matters *where the ultimate decision will not be enhanced or assisted by the receipt of evidence.* And as to interventions raising anticompetitive issues we see no objection in law to a disposition without hearing that is accompanied by an explanation, supported in the record, that the intervenor's contentions are too insubstantial or barren to indicate the existence of substantial anticompetitive issues, *or to meet the requirement of a reasonable nexus between the activities challenged and the activities furthered by the application.*

*Id.* at 953 (emphasis added, citations omitted). Later, addressing the issue as to the SEC, the court went on to state that:

> Where an agency has some regulatory jurisdiction over operations, it must consider whether there is *a reasonable nexus between the matters subject to its surveillance and those under attack on anticompetitive grounds.* But the general doctrine requiring an agency to take account of antitrust considerations *does not extend* to a case like the one before us where the antitrust problem arises out of operations of the

regulated company (past and projected) and the agency, here the SEC, *has not been given any regulatory jurisdiction over operations of the company.* *Id.* at 955 (emphasis added).

*City of Lafayette* was subsequently affirmed *sub nom.* by the Supreme Court in *Gulf States, supra,* 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635, where the Court quite plainly noted that the Commission's broad regulatory "power clearly carries with it the responsibility to consider, *in appropriate circumstances,* the anticompetitive effects of *regulated aspects of interstate utility operations* pursuant to §§ 202 and 203, and under like directives contained in §§ 205, 206, and 207." *Id.* at 758–59, 93 S.Ct. 1870, 36 L.Ed.2d 635 (emphasis added). However, the Court also recognized the Commission's discretion to dispose summarily of anticompetitive objections, cautioning that in such situations

> "the reviewing court must closely scrutinize its action in light of the . . statutory obligations to protect the public interest and to enforce the antitrust laws. Whether or not an abuse of discretion is present must ultimately depend upon the transaction approved, its possible consequences, and any justifications for the deferral" or summary treatment.

*Id.* at 763, 93 S.Ct. at 1880, *quoting, Denver & Rio Grande, supra,* 387 U.S. at 498, 87 S.Ct. 1754, 18 L.Ed.2d 905. Essentially, what the Commission must provide is a properly reasoned explanation for its summary disposition. We think the Commission has done so in the case before us.

Here, NCPA challenged the PG&E–SMUD contracts "insofar as they purport to empower PG&E to exclude NCPA from any participation in SMUD's electric power generation." J.A. II. at 141. However, NCPA did not allege rate discrimination or that the proposed rates were unjust or unreasonable. It did not even assert that the proposed

rates were somehow a part of PG&E's alleged anticompetitive "scheme". NCPA sought only to have the contracts held unlawful unless and until they provided for increased capacity of SMUD's thermal units for NCPA's use. *Id.* The Commission simply does not possess the authority to order such capacity increases in SMUD's nuclear plants.

NCPA responds to this analysis by maintaining that it did not ask the Commission to exercise jurisdiction over SMUD but rather, to exercise the jurisdiction it does have over PG&E to hold the contracts unlawful. NCPA then asserts that the "contracts could be made legal" if the Commission ordered them to be amended to accomplish NCPA's requested relief. Petitioner's Reply Br. at 16–17. The clear import of such a procedure would necessitate the Commission doing indirectly what it cannot do directly. The Commission wisely avoided this procedure. *See* Central West Utility Co. v. FPC, 247 F.2d 306 (3rd Cir. 1957).

■ On the record in this case, we do not think that NCPA met its burden of showing a reasonable nexus between the alleged anticompetitive scheme of PG&E and the activities furthered by the PG&E SMUD contracts filed as rate schedules. The "transaction" approved here consisted *only* of the rates that PG&E will be charging SMUD. While the consequences of approving the rate schedules could possibly further the alleged anticompetitive scheme, NCPA neither challenged the rates nor asserted their particular relevance to the alleged scheme. Finally, the Commission's jurisdictional reasons for not further investigating NCPA's charges appear well-founded. We question the wisdom of requiring the Commission to investigate that which it has no authority to remedy. Under these circumstances, we cannot say that the Commission's summary disposition of NCPA's complaint was an abuse of discretion.[3]

Affirmed.

---

3. Without intimating any view of the possible merits, *vel non,* of NCPA's allegations against PG&E, we think it appropriate to suggest that existing antitrust laws may well be the most beneficial means of airing NCPA's grievances. *See, e. g.,* Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).