638 F.2d 388
 NEW YORK STATE ELECTRIC & GAS CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Village of Penn Yan, New York, Municipal Electric Utilities
Association of New York State, Intervenors.
 No. 714, Docket 79-4185.
 United States Court of Appeals,
Second Circuit.
 Argued March 31, 1980.
Decided Sept. 30, 1980.
 
 Frederic H. Lawrence, New York City (Kenneth M. Jasinski, Huber, Magill, Lawrence & Farrell, New York City, on the brief), for petitioner.
 Jane C. Murphy, Washington, D. C. (Robert R. Nordhaus, Gen. Counsel, Jerome Nelson, Sol., Federal Energy Regulatory Commission, Washington, D. C., on the brief), for respondent.
 J. Cathy Lichtenberg, Washington, D. C. (Frederick D. Palmer, Duncan, Weinberg, Palmer & Miller, P. C., Washington, D. C., on the brief), for intervenors.
 Before VAN GRAAFEILAND and KEARSE, Circuit Judges, and GOETTEL, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 This is a petition by New York State Electric & Gas Corporation ("NYSEG") for review of orders of the Federal Energy Regulatory Commission (the "Commission"), invalidating certain provisions in contracts entered into by NYSEG with, respectively, the Power Authority of the State of New York ("PASNY") and the Village of Penn Yan, New York ("Penn Yan" or the "Village") on the grounds that the provisions violated federal antitrust policy. NYSEG contends that the orders should be vacated because the Commission lacked jurisdiction over the contracts in question, because principles of state immunity make federal antitrust policy inapplicable, and because the Commission failed to comply with pertinent provisions of the Federal Power Act ("FPA").
 
 
 2
 We conclude that the Commission has jurisdiction to require the filing and modification of the challenged contracts, but that a hearing should have been held in order for the Commission to assess the public interest in those contracts and that the Commission's orders, without complying with statutory requirements, require the provision of transmission services, known as "wheeling," within the meaning of § 211 of the FPA. Accordingly, we vacate the orders and remand to the Commission for proceedings consistent with §§ 206, 211 and 212 of the FPA.
 
 I. FACTUAL BACKGROUND[1]
 A. The Parties and the Contracts
 
 3
 NYSEG is a New York corporation engaged in the generation, purchase, transmission and wholesale and retail distribution of electric power and energy. It is a public utility subject to the provisions of the FPA; it provides transmission services to PASNY and sells or has sold power to Penn Yan and other communities.
 
 
 4
 Village of Penn Yan is a municipal corporation located in Yates County, New York. It owns an electric utility, Penn Yan Municipal Board, which is a wholesale purchaser and retail distributor of electric energy. References to "Penn Yan" include its electric utility.
 
 
 5
 PASNY is "a political subdivision" of New York State which is responsible for helping to maximize "beneficial use" of the Niagara and St. Lawrence Rivers, including the development of hydroelectric power. N.Y.Pub.Auth.Law §§ 1002, 1001 (McKinney 1970 & Supp.1979-1980). Under the New York Power Authority Act, PASNY is directed and authorized, inter alia, to "make provision so that municipalities and other political subdivisions of the state ... may secure a reasonable share of the power generated" by the Niagara and St. Lawrence hydroelectric projects, and to construct or acquire, by contract, the use of transmission lines to conduct electricity to purchasers. N.Y.Pub.Auth.Law §§ 1005.5, 1005.7 (McKinney Supp.1979-1980). PASNY generates energy at the Niagara Power Project and sells that power on a wholesale basis to NYSEG and to other customers by means of transmission lines furnished by NYSEG.
 
 
 6
 The Commission, successor to the Federal Power Commission,[2] has jurisdiction over all facilities for "the transmission of electric energy in interstate commerce and ... the sale of electric energy at wholesale in interstate commerce." FPA § 201, 16 U.S.C. § 824(b) (1976). It has the power to identify and remedy certain unjust or unreasonable rates, charges or contracts of public utilities. FPA § 206, 16 U.S.C. § 824e (1976).
 
 
 7
 The present proceeding involves a 1961 contract between NYSEG and PASNY, referred to as NS-11, and a 1962 agreement between NYSEG and Penn Yan. The controversy arises out of the desire of Penn Yan for a modification of those contracts.
 
 
 8
 The 1961 contract between NYSEG and PASNY, NS-11, recited PASNY's intention "to enter into agreements ... for the sale, transmission and distribution of power and energy from the (Niagara hydroelectric power development) Project with municipalities and rural electric cooperatives operating electric systems serving rural and domestic consumers within (PASNY's) Niagara market area," and provided that NYSEG would maintain "transmission facilities capable of transmitting Project power within the limits herein provided to such prospective purchasers from (PASNY)." The contract further provided that NYSEG would accept delivery of Project power "into its electric transmission system ... and ... deliver an equivalent amount of electric power and energy ... to (PASNY) for its own use or for municipalities and rural electric cooperatives." Article X, Paragraph 3 of NS-11, limited NYSEG's obligation to deliver power for PASNY as follows:The electric power and energy to be delivered by (NYSEG) to (PASNY) for customers from the system of (NYSEG) will be limited to such electric power and energy as is necessary for the use, distribution and resale within the area limits served as of the date hereof by the Villages of Bath, Castile, Endicott, Greene, Groton, Marathon, Penn Yan, Silver Springs and Watkins Glen, Chautauqua-Cattaraugus Electric Cooperative, Inc. and Steuben Rural Electric Cooperative, Inc., and for such other loads and customers of (PASNY) as may be mutually agreed upon from time to time.
 
 
 9
 (Emphasis added.) Thus, the NYSEG agreement with PASNY did not obligate NYSEG to transmit Project power for the use of any area annexed to Penn Yan after 1961.
 
 
 10
 In 1962, NYSEG and Penn Yan entered into a contract which terminated a 1956 agreement pursuant to which Penn Yan had been a wholesale purchaser of power from NYSEG. In the 1956 contract, Penn Yan had agreed to purchase from NYSEG all of the electrical energy required within the existing territorial limits of the Village and its franchise area for a 10-year period. In 1962, however, Penn Yan decided to purchase its power from PASNY instead of NYSEG, and so notified NYSEG. NYSEG took the position that this would constitute a breach of the 1956 agreement and would result in damages to NYSEG in the amount of $95,910.48. Penn Yan decided to pay NYSEG this amount to buy out of the 1956 agreement. Reciting (a) that Penn Yan "believe(s) that it is to its financial advantage to obtain its electrical energy requirements" from PASNY, (b) that the required energy to be supplied to PASNY could be delivered through NYSEG's transmission facilities "under an appropriate contract" between NYSEG and PASNY, and (c) that NYSEG "has entered into an agreement with (PASNY) for the delivery by (NYSEG) of such power and energy as is necessary for the use, distribution and resale within the area limits served as of February 10, 1961" by Penn Yan, the 1962 agreement terminated the 1956 agreement, required Penn Yan to pay NYSEG $95,910.48 in settlement of its claims, freed Penn Yan to contract with PASNY for supply of Penn Yan's energy needs, and required NYSEG to continue to supply Penn Yan with energy until such time as PASNY commenced to do so. Paragraph 3 of this agreement, however, included the following limitation:
 
 
 11
 (Penn Yan) will take from (PASNY) under such contract only such electric energy required by the Village within the territorial limits, as of February 10, 1961, of the Village and its franchise area outside the Village as approved by the Public Service Commission of the State of New York, (a) for its own use, and (b) for distribution and resale to its existing and future customers.
 
 
 12
 This territorial limit was identical (with the exception, of course, of the date) to the limit provided in the 1956 agreement, and corresponded to the limit on NYSEG's obligation to transmit PASNY energy as set out in Article X, Paragraph 3 of NS-11.
 
 
 13
 In 1967, Penn Yan annexed an area known as Excell Estates, which had been part of the Town of Milo, a customer of NYSEG. Three years later, Penn Yan sought a modification of the 1962 agreement to permit the Village to serve as distributor to residential customers in Excell Estates. NYSEG denied the request, noting that "Paragraph 3 of (the 1962) Agreement was specifically designed to preserve the territorial integrity of (NYSEG's) franchise area as of February 10, 1961."[3] In March 1978, Penn Yan again requested a modification to enable it to supply power to Excell Estates. Again NYSEG refused.
 
 B. Proceedings Before the Commission
 
 14
 On May 25, 1978, Penn Yan filed with the Commission a petition for a declaratory order invalidating Article X, Paragraph 3 of NS-11 insofar as it limited the territories of Penn Yan and other communities to which NYSEG was required to transmit power for PASNY. The petition claimed, inter alia, that the contract provision violated the Niagara Redevelopment Act of 1957 ("NRA") and the FPA, as well as state and federal public policy. Penn Yan subsequently moved to compel the filing by NYSEG of the 1962 agreement, and sought a declaration that Paragraph 3 of that agreement also was unenforceable.
 
 
 15
 On July 20, 1978, NYSEG sought to intervene in the proceeding on Penn Yan's petition and opposed the petition on various grounds. In addition to challenging the jurisdiction of the Commission under the FPA and the NRA, NYSEG contended that neither its 1961 contract with PASNY nor its 1962 contract with Penn Yan attempted to restrict the area that Penn Yan could serve or the amount of power that Penn Yan could obtain from PASNY. The petition stated that
 
 
 16
 NYSEG has declined to further modify its transmission obligation under NS-11 Paragraph 3 ... because, in the exercise of sound business judgment, NYSEG has determined that it would not be in the public or its corporate interest ... when the result would be an unwarranted duplication of electric service in Excell Estates.
 
 
 17
 In addition, the petition contended that "(t)he relief requested by Penn Yan, if granted, would only result in the Commission compelling NYSEG to 'wheel' power involuntarily for a direct competitor,"[4] and NYSEG argued that neither the FPA nor the NRA requires NYSEG to provide unlimited transmission services.
 
 
 18
 After receiving the above petitions, as well as comments from PASNY[5] and several supplementary filings by Penn Yan and NYSEG, but without holding a hearing, the Commission, on March 28, 1979, rejected all of NYSEG's arguments and declared Article X, Paragraph 3 of NS-11, along with Paragraph 3 of the NYSEG-Penn Yan agreement and any similar NYSEG agreements with other customers, unenforceable.[6] As to its jurisdiction, the Commission stated:
 
 
 19
 Under Section 201(b) of the Federal Power Act, a jurisdictional utility is one which sells or transmits electric energy at wholesale in interstate commerce. Therefore the 1962 Agreement and the provision of the NS-11 contract which provide for NYSEG transmission of PASNY power at wholesale to Penn Yan are contracts subject to our jurisdiction. While PASNY is exempt from our jurisdiction as a public authority under Section 201(f), NYSEG is a jurisdictional utility and must file these contracts under Section 205(c).
 
 
 20
 Declaratory Order Modifying Jurisdictional Contracts ("Order"), Docket No. EL78-29 (March 28, 1979) at 4. As to the reasonableness of the challenged contract provisions, the Commission found those provisions to be a direct resale prohibition which served to "protect NYSEG from competition for retail customers and to restrict Penn Yan's ability to extend its municipal system, thereby impairing and diminishing competition to serve retail customers in the extended territories." Characterizing NYSEG's petition as admitting an anticompetitive purpose, the Commission ruled that the provisions violated federal antitrust policy. Finally, as to NYSEG's argument that the requested modification of the contracts would result in an order compelling wheeling, the Commission pointed out that NS-11 itself obligates NYSEG to wheel, and that the challenged provision of NS-11 places restrictions on the purchasers' use of wheeled power. Thus, the Commission characterized its order as one that removes a contractual restriction on the use of wheeled power rather than as one that actually compels wheeling.
 
 
 21
 On April 24, 1979, NYSEG sought a rehearing, again urging, inter alia, that the removal of the territorial limitations resulted in an order compelling wheeling, and arguing that, although such an order was within the Commission's authority under newly enacted statutory provisions,[7] there had been no compliance with the substantive or procedural requirements of those provisions, FPA §§ 211, 212, 16 U.S.C.A. §§ 824j, 824k (Supp.1980). In addition, NYSEG argued that the Commission lacked authority to issue the orders in question because PASNY has sole authority to determine the reasonableness of its contracts and because the challenged provisions were protected from antitrust scrutiny by state action immunity.
 
 
 22
 After an initial order granting rehearing for the limited purpose of reconsideration, the Commission denied the application for rehearing, again rejecting all of NYSEG's contentions.[8] The Commission reiterated its view that the order did not compel wheeling and concluded, therefore, that §§ 211 and 212 were inapplicable. In addition, it ruled that no evidentiary hearing was needed since "the pleadings and the contracts themselves provide a sufficient factual basis for the Commission's finding that the disputed provision is anticompetitive in effect and serves no countervailing public interest objective." Order Denying Rehearing, EL78-29 (September 17, 1979) at 5. This petition for review followed.
 
 II. DISCUSSION
 
 23
 NYSEG asserts here essentially the same arguments it pressed before the Commission. It challenges the Commission's jurisdiction to modify its agreement with PASNY, it asserts that federal antitrust policy is inapplicable in light of PASNY's status as a political subdivision of New York State, and it contends that the Commission's order impermissibly requires NYSEG to wheel power to Penn Yan and other municipal utilities. For the reasons set forth below, we reject NYSEG's jurisdictional and antitrust immunity contentions, but conclude that the Commission's orders should not have been issued without hearings for the consideration of pertinent factors as set forth in FPA §§ 206, 211 and 212.
 
 A. Jurisdiction of the Commission
 
 24
 In support of its attack on the Commission's jurisdiction to review NS-11, NYSEG contends (1) that contracts to which PASNY is a party are exempted from Commission review under FPA § 201(f), and (2) that PASNY has exclusive jurisdiction under the NRA to determine the reasonableness of its own contracts. Neither contention is sound.
 
 1. The Federal Power Act
 
 25
 The FPA was enacted as Part II, of Title II of the Public Utility Act of 1935, 49 Stat. 847. The two primary purposes of the Act were "to curb abusive practices of public utility companies by bringing them under effective control, and to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce. 49 Stat. 803-804, 847-848; S.Rep.No. 621, 74th Cong., 1st Sess., 3, 7-8; Jersey Central Co. v. FPC, 319 U.S. 61, 67-68, 63 S.Ct. 953, 956, 87 L.Ed. 1258 (1943); see North American Co. v. SEC, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1946)." Gulf States Utilities Co. v. FPC, 411 U.S. 747, 758, 93 S.Ct. 1870, 1877, 36 L.Ed.2d 635 (1973). The FPA declares
 
 
 26
 that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation ... and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest.
 
 
 27
 § 201, 16 U.S.C. § 824(a) (1976). In accordance with this statement of policy, the provisions of the FPA are made applicable "to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce";[9] the Commission is given "jurisdiction over all facilities for such transmission or sale of electric energy." § 201(b), 16 U.S.C. § 824(b).
 
 
 28
 In order to facilitate administrative regulation of interstate sales and transmissions, the FPA requires all public utilities[10] to file with the Commission "schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." § 205(c), 16 U.S.C. § 824d(c) (1976). Any changes in rates, charges, etc., similarly must be filed with the Commission. § 205(d), 16 U.S.C. § 824d(d) (1976).
 
 
 29
 Section 205 of the Act mandates that public utility rates and charges be "just and reasonable," 16 U.S.C. § 824d(a) (1976), and the Commission is empowered under § 206 to examine the reasonableness of rates, charges and related contracts and to order remedial modifications:
 
 
 30
 Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.
 
 
 31
 16 U.S.C. § 824e(a) (1976). A finding that the existing provision is " 'unjust, unreasonable, unduly discriminatory or preferential' " is a condition precedent to the Commission's exercise of its power to fix a just and reasonable provision. FPC v. Sierra Pacific Power Co., 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956).
 
 
 32
 Section 201(f) of the FPA exempts states and their political subdivisions from the provisions of the FPA, as follows:
 
 
 33
 No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.
 
 
 34
 16 U.S.C. § 824(f) (1976). NYSEG argues that this provision, notwithstanding the Commission's broad powers detailed above, deprives the Commission of jurisdiction to modify any contract involving PASNY.
 
 
 35
 While there is some surface appeal to NYSEG's argument that modification of an agreement between itself and PASNY is not possible without affecting PASNY, the substance of the Commission's action negatives the conclusion that the Commission seeks to apply provisions of the FPA to PASNY. The orders challenged do not require PASNY to take or to refrain from taking action; they do not place any limitations on PASNY's powers or prerogatives. Rather, the Commission's order is directed strictly to NYSEG, requiring NYSEG to file its contracts with the Commission, and precluding NYSEG from enforcing certain provisions of those contracts. The thrust of the order is that, if PASNY contracts to sell power to Penn Yan for Excell Estates, NYSEG must provide transmission services for that power under its contract with PASNY if PASNY so requests. PASNY has no greater obligations as a result of the Commission's order.
 
 
 36
 The present case is thus plainly distinguishable from Northern California Power Agency v. FPC, 514 F.2d 184 (D.C.Cir.), cert. denied, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975), the sole case relied upon by NYSEG to support its claim that § 201(f) deprives the Commission of jurisdiction. In that case, the Northern California Power Agency ("NCPA") filed a complaint with the Commission alleging that contracts between a jurisdictional utility, Pacific Gas & Electric ("PG&E"), and an exempt public agency, Sacramento Municipal Utility District ("SMUD"), were anticompetitive. NCPA sought an order declaring that these contracts were unlawful and could be made lawful only by being amended to provide for an increase in SMUD's thermal units, with the excess capacity made available to NCPA. The Commission denied NCPA's request for a hearing on the antitrust implications of the PG&E-SMUD contracts, in part on the ground that it lacked jurisdiction to order the remedy sought. The court of appeals affirmed, noting that "(t)he Commission simply does not possess the authority to order ... capacity increases in SMUD's nuclear plants" and that the clear import of the requested relief would be to require the Commission to do indirectly what it cannot do directly. 514 F.2d at 189. Accordingly, the court concluded that "the Commission's jurisdictional reasons for not further investigating NCPA's charges appear well-founded" and that the Commission's summary disposition of NCPA's charges was not an abuse of discretion. Id.
 
 
 37
 Here, by contrast, the requested relief does not, either directly or indirectly, affect the amount of power PASNY is required to provide to any purchaser or the amount of transmission service PASNY is required to purchase from NYSEG. The entire burden of the Commission's order is placed on NYSEG, over which jurisdiction is clear.
 
 
 38
 Nor do the other cases cited by NYSEG have any bearing on the Commission's jurisdiction. Both Airco Alloys Division, Airco, Inc. v. Niagara Mohawk Power Corp., 65 A.D.2d 378, 411 N.Y.S.2d 460 (4th Dep't 1978), and Power Authority of the State of New York v. Federal Energy Regulatory Commission, et al., Civ. No. 79-310 (W.D.N.Y. Feb. 22, 1980), involved a contract between PASNY and Niagara Mohawk Power Corp. entered into in 1961 pursuant to the Niagara Redevelopment Act, 16 U.S.C. § 836(b)(3) (1976). Subsection (b)(3) of that Act requires, as a condition of PASNY's license, that PASNY contract to sell to Niagara Mohawk 445,000 kilowatts of project power "for resale generally to the industries which purchase power produced by (Niagara Mohawk) prior to" June 7, 1956. The subsection was incorporated, as Article 22, in the PASNY-Niagara Mohawk contract. Subsequently, approximately one-fourth of the allocated power was no longer utilized by industries to which it had been allocated prior to 1956, and Niagara Mohawk took the position that this reduced Niagara Mohawk's obligations pro tanto. PASNY commenced a proceeding before the Commission for a declaration that Niagara Mohawk was contractually required to sell the entire 445,000 kilowatts of power to industries in Western New York. The Commission dismissed the petition for lack of jurisdiction; no appeal was taken.
 
 
 39
 The issues dealt with in the two court cases involved the jurisdiction of the respective courts, not that of the Commission. Thus, in Airco Alloys v. Niagara Mohawk, supra, the state court rejected an argument that it lacked jurisdiction because 16 U.S.C. § 825p (1976) grants exclusive jurisdiction over violations of the FPA to federal district courts. The court noted that the plaintiff was not claiming a violation of the FPA or the NRA, but rather noncompliance with the PASNY-Niagara Mohawk contract, and that § 825p did not prevent a state court from deciding whether plaintiff's contractual rights had been violated. Likewise, in PASNY v. Federal Energy Regulatory Commission, supra, there was no allegation of a violation of federal statute, and the federal court held that it lacked jurisdiction simply because the suit was "in essence a declaratory judgment action to clarify the terms of (PASNY's) contract with Niagara Mohawk." The question of the Commission's jurisdiction was not before the district court, since review of the Commission's dismissal must be sought in a court of appeals rather than in a district court. 16 U.S.C. § 825l (b) (1976).
 
 
 40
 In sum, we have been pointed to no authority, and we know of none, that would deprive the Commission of jurisdiction of the present request by Penn Yan for modification of NYSEG's contracts based on their alleged conflict with federal law.
 
 2. The Niagara Redevelopment Act
 
 41
 NYSEG's contention that the NRA gives PASNY sole authority to determine what terms and conditions for the wheeling of Niagara Project power are reasonable has no greater force. The NRA, enacted in 1957, "expressly authorized and directed (the Commission) to issue a license to the Power Authority of the State of New York for the construction and operation of a power project with capacity to utilize all of the United States share of the water of the Niagara River permitted to be used by international agreement."[11] 16 U.S.C. § 836(a) (1976). In addition to "those (conditions) deemed necessary and required under the terms of the Federal Power Act," the Commission was instructed to include in PASNY's license several provisions, including the following:
 
 
 42
 The licensee shall, if available on reasonable terms and conditions, acquire by purchase or other agreement, the ownership or use of, or if unable to do so, construct such transmission lines as may be necessary to make the power and energy generated at the project available in wholesale quantities for sale on fair and reasonable terms and conditions to privately owned companies, to the preference customers enumerated in paragraph (1) of this subsection, and to the neighboring States in accordance with paragraph (2) of this subsection.
 
 
 43
 16 U.S.C. § 836(b)(4) (1976) (emphasis added). NYSEG asks us to construe this provision as giving PASNY exclusive authority to determine whether or not its contracts are fair and reasonable, and contends that support for this view may be found in a negative inference to be drawn from NRA § 836(b)(2). Subsection (b)(2) requires that the Commission condition PASNY's license on PASNY's making a reasonable portion of Niagara Project power available to neighboring states, and provides that "(i)n the event of disagreement between (PASNY) and the power-marketing agencies of any such States, the (Commission) may, after public hearings, determine and fix the applicable portion of power to be made available and the terms applicable thereto."[12] NYSEG argues that since subsection (b)(2) provides for resolution of disputes thereunder by the Commission, the absence of similar provision under subsection (b)(4) means the Commission has no jurisdiction with regard to a dispute under subsection (b) (4).
 
 
 44
 We find nothing in these or any other sections of the NRA to suggest that PASNY has exclusive authority over its contracts involving transmission of Niagara Project power. Section 836(b)(4) does not strip the Commission of the authority or responsibility for assessing the reasonableness of such contracts; its effect is to require PASNY, as a condition of its license, to insure transmission lines for delivery of its power by agreement for use or purchase of such lines or, if such agreements are not available on reasonable terms, to construct the necessary lines. The implication of the mandate to the Commission to impose conditions is that it will be able to enforce those conditions. We do not view the absence from subsection (b)(4) of provision for public hearings such as are required under (b)(2) for power apportionments between states, as implying that the Commission has no jurisdiction to assure that its licensee complies with other conditions of its license.
 
 
 45
 NYSEG's reliance on Airco Alloys v. Niagara Mohawk, supra, is similarly misplaced. As discussed supra, the New York court there merely upheld its own jurisdiction to decide whether PASNY's contractual rights were violated. That decision thus has no bearing on the Commission's jurisdiction to determine the reasonableness, within the meaning of that word under the NRA, of a term included in a PASNY contract.
 
 
 46
 In any event, even assuming that PASNY had exclusive authority to decide whether given energy transmission terms available to it are reasonable,[13] the Commission order at issue here would in no way conflict with such authority, since, as discussed in Part 1 above, the Commission's order does not require PASNY to take, or refrain from taking, any action whatsoever. The only impact of the order upon PASNY is to give PASNY the option of transmitting additional power to Penn Yan over the lines of NYSEG.
 
 B. Applicability of Antitrust Policy
 
 47
 Having determined that the Commission had jurisdiction to entertain Penn Yan's petition, we turn to the question whether the Commission's consideration of the possible anticompetitive nature of provisions of NYSEG's contract with PASNY was barred because of PASNY's status as a subdivision of New York State. We conclude that the Commission was free to consider federal antitrust policy as an aspect of the public interest.
 
 
 48
 The purpose of the Commission's power to identify and remedy unreasonable provisions in utility contracts is "the protection of the public interest, as distinguished from the private interests of the utilities, (as) is evidenced by the recital in § 201 of the Act ...." FPC v. Sierra Pacific Power Co., supra, 350 U.S. at 355, 76 S.Ct. at 372. The policies underlying federal antitrust law are one aspect of the public interest. Thus, the Commission's responsibility for protecting the public interest and its corresponding power to adjust unreasonable rates, etc., "carries with it the responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate utility operations." Gulf States Utilities Co. v. FPC, supra, 411 U.S. at 758-59, 93 S.Ct. at 1877-78.
 
 
 49
 Nevertheless, it is evident that in certain circumstances a state will be immune from liability for its imposition of anticompetitive restraints. In Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that federal antitrust laws do not prohibit a state, as sovereign, from imposing anticompetitive restraints "as an act of government." Id. at 352, 63 S.Ct. at 314. Recent Supreme Court cases identify two criteria for application of Parker immunity: (1) "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy' " and (2) "the policy must be 'actively supervised' by the State itself." California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980), quoting City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.). See also New Motor Vehicle Board of California v. Orrin W. Fox Co., 439 U.S. 96, 109, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978). Even assuming that appropriate circumstances might justify extension of this immunity to conduct by a private party, cf. Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976);[14] Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), both of the prerequisites are lacking here.
 
 
 50
 To begin with, there is no articulation whatever of a state policy underlying the challenged provision of NS-11. The fact that a political subdivision of the state is a party to the contract does not transform the provisions of the contract into state policy. Moreover, even if the contract as a whole had been entered into by PASNY as agent of the sovereign in accordance with "clearly articulated and affirmatively expressed" state policy, there is no suggestion that the challenged restraint itself was mandated by, or even related to, state policy. The petition makes clear that the restrictive provision was desired by NYSEG, and there is no hint that it resulted from state policy. Even if the restrictive provision had been suggested by PASNY rather than NYSEG, the Commission would not be precluded from considering antitrust policy since "(i) t is not enough that ... anticompetitive conduct is 'prompted' by the state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." Goldfarb v. Virginia State Bar, supra, 421 U.S. at 791, 95 S.Ct. at 2015 (emphasis added). Thus we conclude that PASNY's status did not preclude the Commission from considering antitrust policy as one aspect of the public interest.
 
 
 51
 This conclusion, however, does not mean that summary disposition was appropriate. The Commission's determination as to the public interest under § 206 is normally required to be made "after a hearing." While no hearing is required when there are no material facts in issue, Public Service Co. v. FERC, 600 F.2d 944, 955 (D.C.Cir.), cert. denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); Municipal Light Bds. v. FPC, 450 F.2d 1341, 1345 (D.C.Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972); Citizens for Allegan County Inc. v. FPC, 414 F.2d 1125, 1128 (D.C.Cir.1969), the limited record here reveals questions relating to the public interest which could best have been resolved after a hearing. It is true, as emphasized by the Commission, that NYSEG's petition admitted that it preferred not to provide transmission facilities to a competitor for transmission of power to one of NYSEG's present customers. But NYSEG's petition also alleged that the challenged contractual restraints were in the public interest as well, and there was no reason for the Commission to assume, as it did, that NYSEG's self-interest is inherently inconsistent with the public interest. For example, in Lafayette v. Louisiana Power & Light Co., supra, the opinion of the Court discussed the impact on a public utility of loss of customers:[15]
 
 
 52
 The elimination of customers in an established service area would likely reduce revenues, and possibly require abandonment or loss of existing equipment the effect of which would be to reduce its rate base and possibly affect its capital structure. The surviving customers and the investor-owners would bear the brunt of these consequences. The decision to displace existing service, rather than being made on the basis of efficiency in the distribution of services, may be made by the municipality in the interest of realizing maximum benefits to itself without regard to extraterritorial impact and regional efficiency.
 
 
 53
 435 U.S. at 404, 98 S.Ct. at 1132 (footnote omitted). Thus, questions as to the probable impact of the proposed modification on NYSEG, the possible inefficiency in duplicating service, the extent, if any, to which NYSEG might be entitled to a "settlement" similar to that contained in the 1962 agreement, etc., should have been considered in assessing the public interest. Both NYSEG and PASNY requested a hearing on Penn Yan's claims. We do not believe the Commission could properly decide those claims without a hearing.
 
 
 54
 C. The Applicability of Sections 211 and 212
 
 
 55
 Finally, we turn to NYSEG's claim that the Commission exceeded its authority because its order modifying NS-11 compels wheeling without complying with the statutory prerequisites of §§ 211 and 212 of the FPA. The Commission does not contend that an order requiring wheeling need not be preceded by the determinations envisioned by §§ 211 and 212. Rather, it contends that its order modifying NYSEG's contracts with PASNY and Penn Yan does not at all compel wheeling.
 
 
 56
 As the Commission views it, it is NS-11 which obligates NYSEG to wheel; the challenged provision of NS-11 limits Penn Yan's ability to resell the wheeled power to certain customers; and the Commission's order merely removes this restriction. Thus the Commission denies that the territorial limitations have any relationship to the volume of power NYSEG is required to wheel, stating that the only limitation on the amount of power Penn Yan may receive is imposed by its contract with PASNY, and that "Penn Yan's petition indicates that it has not yet reached its full capacity allocation." Most of these premises are disputed by NYSEG, which admits that it committed itself in NS-11 to wheel power to a limited extent, but contends that the Commission's order expands NYSEG's voluntary commitment by eliminating any ceiling on the amount of wheeled power available to Penn Yan and utilities of other communities listed in the challenged provision of NS-11. NYSEG's position is that a valid purpose of defining its wheeling obligation in terms of the existing territories of the listed municipalities was to protect itself from undue volume demands on its transmission lines, a concern that is reflected also in Article IX of NS-11. The latter provision requires PASNY to notify NYSEG annually of its estimate as to the amount of power to be wheeled for the ensuing five years; NYSEG must respond as to whether or not it will be able to transmit these amounts and to state any "qualifications as to voltage, point of delivery or amount of delivery that attaches to any affirmative answer." NYSEG is thereupon obligated to wheel only in accordance with its affirmative answers, as qualified. Presumably the amount of power PASNY allots to Penn Yan will be affected by any limitations that NYSEG has placed on the amount it will wheel for PASNY with regard to Penn Yan. NYSEG stated its belief that in 1978 Penn Yan in fact exceeded its power entitlement under its PASNY contract. The implication is that the Commission's modification of NS-11 may well require NYSEG to wheel more power to Penn Yan than NYSEG deems prudent. Further, NYSEG points out that the Commission's order would permit any other community utility to make similar demands.
 
 
 57
 We agree that the effect of the Commission's order will be to increase beyond NYSEG's voluntary commitment the amount of power NYSEG is required to wheel. It is obvious that Penn Yan does not propose to furnish electricity to Excell homes by reducing the amount furnished to the territory covered by the contracts. What Penn Yan seeks to sell to Excell, therefore, is not the presently wheeled power; it is an amount over and above the amount NYSEG is now wheeling, and the total power sought by Penn Yan may be, or may become, greater than the maximum amount of power that NYSEG has agreed to wheel. Thus, regardless of whether the primary purpose of the challenged paragraph of NS-11 was to limit the calls on NYSEG's lines or was to protect NYSEG from competitive raids on its other customers, the effect of the Commission's order is to expand NYSEG's commitment to wheel.
 
 
 58
 With this factual analysis, the legal question becomes whether FPA §§ 211 and 212 should be interpreted narrowly to apply only to a Commission order to wheel where no wheeling had previously been ordered or agreed to, or whether they should apply also to an order expanding a voluntary pre-existing commitment to wheel. While the statutory provisions, on their face, offer little guidance on this question, the purpose and history of the Commission's statutory powers to compel wheeling persuade us that §§ 211 and 212 apply to orders that would expand a voluntary commitment to wheel.
 
 
 59
 As originally enacted, the FPA did not permit the Commission to compel wheeling. Prior to its enactment, provisions were proposed which would have required " 'every public utility to ... transmit energy for any person upon reasonable request' " and would have "empowered the Federal Power Commission to order wheeling if it found such action to be 'necessary or desirable in the public interest.' H.R. 5423, 74th Cong., 1st Sess.; S. 1725, 74th Cong., 1st Sess. These provisions were eliminated to preserve 'the voluntary action of the utilities.' S.Rep.No. 621, 74th Cong., 1st Sess., 19." Otter Tail Power Co. v. United States, 410 U.S. 366, 374, 93 S.Ct. 1022, 1028, 35 L.Ed.2d 359 (1973). Congress thereby revealed its preference for reliance on "voluntary commercial relationships" rather than on "a pervasive regulatory scheme for controlling the interstate distribution of power." Id.[16]
 
 
 60
 In November 1978, however, the Public Utility Regulatory Policies Act, amending the FPA, granted the Commission certain additional powers, including the power to compel wheeling.[17] Under new FPA §§ 211 and 212, the Commission may require one electric utility to provide transmission services for another utility, provided certain substantive and procedural requirements are met. Section 211 states, in relevant part:
 
 
 61
 Upon receipt of such application (by one utility for transmission services of another utility), after public notice and notice to each affected State regulatory authority, each affected electric utility, and each affected Federal power marketing agency, and after affording an opportunity for an evidentiary hearing, the Commission may issue such order if it finds that such order-
 
 
 62
 (1) is in the public interest,
 
 
 63
 (2) would-
 
 
 64
 (A) conserve a significant amount of energy,
 
 
 65
 (B) significantly promote the efficient use of facilities and resources, or
 
 
 66
 (C) improve the reliability of any electric utility system to which the order applies, and
 
 
 67
 (3) meets the requirements of section 824k of this title.
 
 
 68
 16 U.S.C.A. § 824j(a). Section 211 further provides that no such order may be issued "unless the Commission determines that such order would reasonably preserve existing competitive relationships." 16 U.S.C.A. § 824j(c)(1).
 
 
 69
 In accordance with § 212,
 
 
 70
 No order may be issued by the Commission under ... subsection (a) or (b) of section 824j of this title unless the Commission determines that such order(1) is not likely to result in a reasonably ascertainable uncompensated economic loss for any electric utility ... affected by the order;
 
 
 71
 (2) will not place an undue burden on an electric utility ... affected by the order;
 
 
 72
 (3) will not unreasonably impair the reliability of any electric utility affected by the order; and
 
 
 73
 (4) will not impair the ability of any electric utility affected by the order to render adequate service to its customers.
 
 
 74
 The determination under paragraph (1) shall be based upon a showing of the parties. The Commission shall have no authority under section ... 824j of this title to compel the enlargement of generating facilities.
 
 
 75
 16 U.S.C.A. § 824k(a).
 
 
 76
 The new power to order wheeling was undoubtedly intended, at least in part, to serve as a tool for enhancing competition by facilitating bulk purchases of power. See H.R.Rep. No. 95-496 (IV), 95th Cong. 1st Sess. 151 (1977) reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 7855, 8454, 8593-94; S.Rep. No. 95-442, 95th Cong. 1st Sess. 32 (1977) reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 7903, 7929. On the other hand, in contrast to determinations under § 206 which focus on public, not private, interest,[18] it is clear from the express requirements of §§ 211 and 212 that the public interest and the enhancement of competition are not alone sufficient justification for compelling wheeling. Findings under § 211 must assess the impact of such an order on specific aspects of private interests as well: the Commission must find that the order is not likely to cause the transmitting utility to suffer an uncompensated economic loss or other undue burden; the Commission must find that the applicant for transmission services has demonstrated that he is ready, willing, and able to pay the reasonable costs of transmission services plus a reasonable rate of return on such costs; and the Commission must find that the wheeling order would reasonably preserve existing competitive relationships. Cf. H.R.Rep. No. 95-496 (IV), supra at 152, (1978) U.S.Code Cong. & Admin.News at 8595 (emphasizing "statutory safeguards plus judicial scrutiny" to insure fair treatment and full compensation). Finally, even when all prerequisites for the issuance of an order compelling wheeling have been met, the Commission is instructed to issue a proposed order, so as to allow the parties themselves an opportunity to agree on terms and conditions. § 212(c)(1), 16 U.S.C.A. § 824k(c)(1).[19]
 
 
 77
 These requirements reflect an intent to safeguard the voluntariness of wheeling arrangements to the greatest extent possible while providing "assurance to all persons that they will be treated fairly and compensated fully" if they are compelled to provide involuntary services. H.R.Rep. No. 95-496 (IV), supra, at 152, (1978) U.S.Code Cong. & Admin.News at 8595. The narrow interpretation of § 211 urged by the Commission to exclude its modification of NS-11 from the ambit of § 211 would, in our view, be inconsistent with Congress' intent.
 
 
 78
 This conclusion does not suggest that we would view the Commission's modification of the NYSEG-Penn Yan contract, by itself, as an order to wheel. Simple elimination of Penn Yan's undertaking not to contract with PASNY for energy beyond the needs of customers within the Village's 1961 territorial limits, would appear to do no more than permit Penn Yan to expand its wholesale purchase contract with PASNY; this, without the ordered modification of NS-11, would not compel wheeling. Nor do we suggest that the Commission is powerless to review a wheeling agreement under § 206 without following the requirements of §§ 211 and 212. If, after a hearing as required by § 206, the Commission determines that a particular rate, charge, or condition is unreasonable, it can order a modification. But where, as here, the modification amounts to an order requiring wheeling, it must be preceded also by determinations in accordance with §§ 211 and 212. Simply put, we will not allow the Commission to do indirectly without compliance with the statutory prerequisites, what it could not do directly without such compliance. Cf. Richmond Power & Light v. FERC, 574 F.2d 610, 620 (D.C.Cir.1978).
 
 
 79
 For the foregoing reasons, we affirm so much of the Commission's orders as required the filing of the contracts, and we vacate so much of the orders as modified the contracts, and remand for proceedings not inconsistent with this opinion.
 
 
 80
 GOETTEL, District Judge (concurring and dissenting):
 
 
 81
 While I do not disagree with the analysis of the law in the comprehensive opinion of the Court, I dissent from the conclusion in Part II-C that the modification of the contract NS-11 by the Commission amounts to the requiring of wheeling, thereby necessitating compliance with the statutory prerequisites of §§ 211 and 212 of the FPA. My contrary conclusion is restricted to the facts of this case, which show the minimal effect of the modification on the amount of power being wheeled.
 
 
 82
 A respectable argument can be made that the Commission's modification does not compel wheeling at all. NYSEG agreed with PASNY in 1961 (in NS-11), to wheel PASNY power to municipalities, including the Village of Penn Yan, in exchange for benefits to be received by NYSEG. In 1962, NYSEG, in exchange for $95,910.48, released Penn Yan from its 1956 agreement to purchase power from NYSEG, enabling Penn Yan to purchase its power from PASNY and have that power transmitted over NYSEG lines under the 1961 NYSEG-PASNY contract. In accordance with the 1962 agreement between NYSEG and Penn Yan, NYSEG wheels the power to the Village, which then transmits it to its customers. Thus, the addition of the Excell Estates customers does not involve any additional transmission by NYSEG in terms of distance. The Commission found that the territorial restriction removed by the modification served to limit only the use rather than the amount of power. Consequently, the modification did not augment NYSEG's wheeling obligation and thus was not, per se, a wheeling order.[1]
 
 
 83
 As a practical matter, of course, increasing the permissible uses of the power Penn Yan receives over NYSEG lines could have the effect of increasing the amount of that power. Realistically, if the Village of Penn Yan were merging with another village of equal size, the effect would be to double immediately the amount of power to be wheeled. If that were the case here, it would be hard to argue with the position of the Court. But Excell Estates is composed of only twenty-seven houses. The additional power NYSEG is required to wheel to Penn Yan for those additional twenty-seven houses, in the context of other variables affecting the amount of power to be wheeled, is de minimis.
 
 
 84
 When NYSEG agreed to wheel PASNY power to Penn Yan, it had no assurance that the Village would not grow in population or consumption of electric power. Within the old territorial limits, the number of customers could have increased, moderately or even drastically. In fact, it did not. According to official United States census figures,[2] the population of Penn Yan declined between 1960 and 1970, despite the annexation of Excell Estates. On the other hand, even though its population declined, Penn Yan's consumption of electric power, like that of the nation as a whole,[3] probably increased substantially. Given these facts, I view the addition of Excell Estates (constituting between one percent and two percent of the population of the Village of Penn Yan) as having a de minimis effect on the amount of power wheeled to Penn Yan. Consequently, I would not require the Commission to comply with §§ 211 and 212 of the FPA before modifying the wheeling agreement to allow that effect.
 
 
 85
 The same considerations apply in part to the decision of the Court requiring a hearing pursuant to § 206 of the FPA. However, PASNY has requested such a hearing, and the precedential effect of striking the territorial limitation for all of the villages covered by the original 1961 contract[4] is involved. (Some of those villages may have had material changes in their geographical boundaries.) Consequently, there is more reason for requiring such a hearing than there is for requiring the Commission to comply with §§ 211 and 212 before deciding whether NYSEG should assist in servicing an additional twenty-seven customers in the Village of Penn Yan.
 
 
 
 *
 Honorable Gerard L. Goettel, Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Since the Commission entered its order without holding an evidentiary hearing, our summary of the facts is drawn from the various documents filed with the Commission
 
 
 [2]
 Initially, enforcement powers under the FPA were granted to the Federal Power Commission. Effective October 1, 1977, the duties of the Federal Power Commission were subsequently transferred to the Federal Energy Regulatory Commission, 42 U.S.C. § 7172(b) (Supp. II 1978). References herein to "Commission" include both the present commission and its predecessor
 
 
 [3]
 NYSEG had agreed in 1968 to modify the contract to permit Penn Yan Municipal Board to provide street lighting in Excell Estates, but its response to the 1970 request stated that "(t)he reason for permitting a modification in the case of municipal street lighting does not obtain with respect to the provision for residential electric service."
 
 
 [4]
 "Wheeling" has been defined as a "transfer by direct transmission or displacement electric power from one utility to another over the facilities of an intermediate utility." Otter Tail Power Co. v. United States, 410 U.S. 366, 368, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973). In this case, the transfer of power from PASNY to Penn Yan Municipal Board through the transmission lines of NYSEG constitutes wheeling
 
 
 [5]
 On July 19, 1978, PASNY sent the Commission a letter taking the position that the PASNY-NYSEG contract is not restrictive since it permits service to "such other loads and customers of (PASNY) as may be mutually agreed upon from time to time," and contending that Penn Yan's difficulties stem solely from its own agreement with NYSEG. In that letter and subsequently, PASNY reserved its right, as a signatory to NS-11, to participate in the proceeding if the Commission should decide to consider Penn Yan's petition
 
 
 [6]
 The order required NYSEG, pursuant to FPA § 205, to file NS-11, the 1962 agreement with Penn Yan, and any similar contracts. On April 27, 1979, under protest, NYSEG filed its contracts with PASNY, Penn Yan, and the villages of Bath, Castile, Endicott, Greene, Groton, Marathon, Silver Springs, and Watkins Glen
 
 
 [7]
 See part II.C., infra
 
 
 [8]
 The filing and denial of an application for rehearing were prerequisites to this Court's appellate jurisdiction pursuant to 16 U.S.C. § 825l (1976)
 
 
 [9]
 FPA § 201(d) defines "sale of electric energy at wholesale" as "a sale of electric energy to any person for resale." 16 U.S.C. § 824(d) (1976)
 
 
 [10]
 The FPA defines "public utility" as "any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter." § 201(e), 16 U.S.C. § 824(e) (1976)
 
 
 [11]
 The purpose of the Niagara Redevelopment Act was "to authorize the construction of a hydroelectric power project on the Niagara River at Niagara Falls, N.Y., which would utilize all of the United States share of the amount of water in the Niagara River made available for power redevelopment under the terms of a treaty between the United States and Canada entered into in 1950." H.R.Rep.No. 862, 85th Cong., 1st Sess. (1957), reprinted in (1957) U.S.Code Cong. & Admin.News, pp. 1585, 1586
 
 
 [12]
 Subsection (b) provides in pertinent part as follows:
 (b) The Federal Power Commission shall include among the licensing conditions, in addition to those deemed necessary and required under the terms of the Federal Power Act (16 U.S.C. § 791a et seq.), the following:
 (1) In order to assure that at least 50 per centum of the project power shall be available for sale and distribution primarily for the benefit of the people as consumers, particularly domestic and rural consumers, to whom such power shall be made available at the lowest rates reasonably possible and in such manner as to encourage the widest possible use, the licensee in disposing of 50 per centum of the project power shall give preference and priority to public bodies and nonprofit cooperatives within economic transmission distance. In any case in which project power subject to the preference provisions of this paragraph is sold to utility companies organized and administered for profit, the licensee shall make flexible arrangements and contracts providing for the withdrawal upon reasonable notice and fair terms of enough power to meet the reasonably foreseeable needs of the preference customers.
 (2) The licensee shall make a reasonable portion of the project power subject to the preference provisions of paragraph (1) of this subsection available for use within reasonable economic transmission distance in neighboring States, but this paragraph shall not be construed to require more than 20 per centum of the project power subject to such preference provisions to be made available for use in such States. The licensee shall cooperate with the appropriate agencies in such States to insure compliance with this requirement. In the event of disagreement between the licensee and the power-marketing agencies of any of such States, the Federal Power Commission may, after public hearings, determine and fix the applicable portion of power to be made available and the terms applicable thereto: Provided, That if any such State shall have designated a bargaining agency for the procurement of such power on behalf of such State, the licensee shall deal only with such agency in that State. The arrangements made by the licensee for the sale of power to or in such State shall include observance of the preferences in paragraph (1) of this subsection.
 The 50% provision in (b)(1) was described as "a satisfactory compromise" between "the Federal preference policy which accords priorities in power marketing to public distribution systems and nonprofit cooperatives" and the state's view that "such preference requirements would adversely affect (PASNY's) ability to sell revenue bonds to finance the construction of the Niagara project." H.R.Rep.No. 862, supra, (1957) U.S.Code Cong. & Admin.News at 1593.
 
 
 [13]
 The provisions of the New York Power Authority Act, invoked by NYSEG, have no bearing on the Commission's jurisdiction in this case. While those provisions spell out PASNY's responsibilities under state law, see N.Y.Pub.Auth. Law § 1005 (McKinney), they do not, and indeed could not, limit the jurisdiction of the federal agency responsible for enforcing and administering the FPA. In the absence of persuasive proof, and NYSEG offers none, we cannot assume that Congress intended to replace the Commission's assessment of public interest, including its consideration of federal antitrust policies, with PASNY's assessment of public interest, made pursuant to its authority under New York state law
 
 
 [14]
 We cannot say that New York's regulation of utilities, pervasive though it may be, is sufficient to immunize regulated utilities from antitrust liability. In Cantor v. Detroit Edison Co., supra, the Court observed that state action immunity might reasonably be extended to private conduct where "a private citizen has done nothing more than obey the command of his state sovereign, (and) it would be unjust to conclude that he has thereby offended federal law," or where "the State is already regulating an area of the economy, (and) it is arguable that Congress did not intend to superimpose the antitrust laws as an additional, and perhaps conflicting, regulatory mechanism." 428 U.S. at 592, 96 S.Ct. at 3118. Nevertheless, the opinion noted that "(t)he Court has already decided that 'state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity,' " id. at 592-93, 96 S.Ct. at 3118 (footnotes omitted), and pointed out that "(t)here is no logical inconsistency between requiring (a public utility) to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." Id. at 596, 96 S.Ct. at 3120. Cf. Gulf States Utilities Co. v. FPC, supra, 411 U.S. at 758-59, 93 S.Ct. at 1877-78; Otter Tail Power Co. v. United States, supra
 
 
 [15]
 Lafayette v. Louisiana Power & Light Co. involved an antitrust suit brought by several Louisiana cities against an investor-owned utility (LP&L). LP&L counterclaimed, alleging various antitrust violations, including an illegal tying arrangement whereby one city contracted to provide gas and water service to LP&L electric customers outside city limits only on condition that the customers purchase electricity from the city rather than from LP&L. The municipalities moved for dismissal of the counterclaim on the ground that they were immune from antitrust liability. A majority of the Court held that in some circumstances, a municipality might be immune from liability as an agent of the state, but that no congressional intent to exempt local governments from federal antitrust laws could be inferred. Justice Brennan's analysis of the potential impact of eliminating customers from an established service area appears in Part I of his opinion, in which, joined by four other Justices, he concluded that practices designed to maximize benefits for the municipal constituencies may have an adverse impact upon the investor-owned utility and its customers and, accordingly, do not necessarily serve the national public interest
 
 
 [16]
 The Act's reliance on voluntary commercial relationships was one factor that persuaded the Supreme Court that industries regulated under the FPA were not immunized from antitrust liability and that federal courts, to remedy antitrust violations, could order a utility to wheel power. Id
 
 
 [17]
 Although these provisions became effective after Penn Yan's petition was filed, there does not seem to be any dispute that the Commission could use its new powers in deciding that petition
 
 
 [18]
 For example, a contract rate cannot be held unreasonable under § 206(a) solely because it yields less than a fair return on invested capital. See FPC v. Sierra Pacific Power Co., supra, 350 U.S. at 355, 76 S.Ct. at 372
 
 
 [19]
 Section 212(c)(1) provides, in part:
 Before issuing an order under ... subsection (a) or (b) of section 824j of this title, the Commission shall issue a proposed order and set a reasonable time for parties to the proposed ... transmission order to agree to terms and conditions under which such order is to be carried out, including the apportionment of costs between them and the compensation or reimbursement reasonably due to any of them.
 
 
 [1]
 All of the existing authorities concerning the inability of the Commission to compel wheeling seem to deal with cases in which there was no pre-existing wheeling agreement
 2 U.S. Dep't of Commerce, 1970 Census Population, Vol. 34, § 1, at 34-14.
 
 
 [3]
 Between 1960, the year before the agreement at issue, and 1978, when the current dispute arose, average per capita energy consumption in the United States increased approximately fifty percent. U.S. Dep't of Commerce, Bureau of the Census, Statistical Abstract of the United States 602 (100th ed. 1979)
 
 
 [4]
 The villages covered are Bath, Castile, Endicott, Greene, Groton, Marathon, Penn Yan, Silver Springs, and Watkins Glen; in addition, the contract covers Chautauqua-Cattaraugus Electric Cooperative and Steuben Rural Electric Cooperative